Dan J. Schulman
Deric Gerlach
SCHULMAN BLACKWELL LLP
Attorneys for Plaintiffs
11 Broadway, Suite 615
New York, New York 10004
(646) 225-6600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SGM HOLDINGS LLC AND RICHARD R. FEATHERLY, <br><br>                   Plaintiffs, <br><br>         - against - <br><br> PAUL K. LISIAK, METROPLITAN EQUITY PARTNERS LLC, METROPOLITAN EIH13 LP, METROPOLITAN GP HOLDINGS LLC - SERIES E1H13, REED ENERGY LLC, NFI ACQUISITON COMPANY INC., AND NORTH EAST FUEL INC., <br><br>                 Defendants. | ECF CASE <br><br> Case No.: 13-CV-5224 (AKH)_____ <br><br> **COMPLAINT** |

            Plaintiffs SGM Holdings LLC ("SGM"), and Richard R. Featherly ("Featherly" and together with SGM, the "SGM Parties" or "Plaintiffs"), by and through their undersigned attorneys, respectfully allege as and for their Complaint against Defendant Paul K. Lisiak ("Lisiak"), Defendant Metropolitan Equity Partners LLC ("MEP"), Defendant Metropolitan EIH13 LP ("MET13" or "Defendant"), Defendant Metropolitan GP Holdings LLC - Series E1H13 ("METGP"), Defendant Reed Energy LLC ("Reed"), Defendant NFI Acquisition Company Inc. ("NFI") and Defendant North East Fuel Inc. ("NE Fuel") (collectively, the "Lisiak Parties" or "Defendants") as follows:

## NATURE OF THE ACTION

1.      This action principally seeks damages for breach of contract arising out of the Lisiak Parties' multiple, egregious, and willful breaches of multiple provisions of a detailed settlement agreement (the "Global Settlement Agreement") that they entered into with the SGM Parties less than eight months ago, as of November 30, 2012, despite SGM's and Mr. Featherly's repeated demands that Lisiak Parties comply with their express obligations. As noted below, Lisiak -- on behalf of the Lisiak Parties- has expressly admitted many breaches, but willfully and deliberately refuses to comply with the contractual obligations, which Lisiak Parties have breached and anticipatorily breached. Plaintiffs also seek declaratory relief, including a declaration that SGM Parties are not required to provide "services" in light of the breaches by Reed and other Lisiak Parties; a declaration that Lisiak Parties are bound to make payments of compensation and other substantial payments exceeding $2.5 million due under the Global Settlement Agreement; and an injunction barring further and future breaches by Lisiak Parties of the Global Settlement Agreement, including an injunction barring Lisiak Parties from further acts of disparagement, and an injunction barring Lisiak Parties from threatening and encouraging litigation as against SGM Released Parties, including SGM Parties, as well as Regent Private Capital LLC and its principals and members.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) based upon the complete diversity of citizenship between plaintiffs and all defendants.

3.      Plaintiffs also seek declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

4.      The amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      This Court has personal jurisdiction over the Lisiak Parties as they reside or conduct business in the State of New York.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) & (2), because defendants Lisiak and Metropolitan Equity Partners LLC ("MEP") are resident in this district, and a substantial part of the events giving rise to the claim occurred in this judicial district. Further, venue is proper because this litigation concerns breaches of a settlement agreement governed by the laws of this State, which agreement specifies sole and exclusive venue in the State or federal courts located in the State and County of New York.

## THE PARTIES

7.      Plaintiff SGM Holdings LLC ("SGM") is a Delaware limited liability company having its principal place of business located at 3075 Charlevoix Drive, Suite 175, Grand Rapids, MI 49546. SGM's members are all Michigan residents.

8.      Plaintiff Featherly is the President of SGM and a Michigan resident.

9.      Defendant Lisiak is an individual who is resident in New York.

10.     Lisiak is also Managing Partner of defendant MEP.

11.     Lisiak is also Manager of METGP, the General Partner of defendant MET13, which is a limited partnership.

12.     Lisiak is also Chairman of Reed.

13.     Defendant MEP is a Delaware limited liability corporation with a principal place of business in this judicial district located at 70 East 55th Street, 15th Floor, New York, NY 10022. MEP is also the management company of MET13. On information and belief, Lisiak

(a NY resident) and Adrian Blumfield (a Colorado resident) are members of MEP. On information and belief, no member of MEP is a Michigan resident, and MEP is not a Michigan resident.

14. Defendant MET13 is a Delaware limited partnership having a principal place of business located at 70 East 55th Street, 15th Floor, New York, NY 10022. On information and belief, MET13 is a resident of New York, based on the citizenship of its general partner, METGP, and MET13 is not a Michigan resident.

15. Defendant METGP, the general partner of MET13, is a Delaware limited liability corporation with a principal place of business located at 70 East 55th Street, 15th Floor, New York, NY 10022. On information and belief, METGP is a New York resident, no member of METGP is a Michigan resident, and METGP is not a Michigan resident.

16. Defendant Reed is a Delaware limited liability company with a principal place of business located at c/o Metropolitan Equity Partners LLC, 70 East 55th Street, 15th Floor, New York, NY 10022. Reed is in excess of 90% owned by MET13; approximately 8% owned by Jason Henthorne, who is an Ohio resident, and is also the chief executive officer of Reed (and, on information and belief, the chief executive officer of NE Fuel); and on information and belief, less than 1% of Reed is currently owned by AMF Productions LLC ("AMF"), an Wyoming LLC that is 100% owned by Oklahoma residents. AMF reportedly acquired its interest in 2012 from Regent Private Capital LLC, another Oklahoma limited liability company 100% owned by Oklahoma residents. No member of Reed is a Michigan resident, and Reed is not a Michigan resident.

17. Defendant MET13 owns over 90% of Reed on a fully diluted basis and is also the senior secured creditor of Reed, with total control over Reed's operations.

18.     On information and belief, Met13 appointed all four members to the Board of Reed. Three of the four board members of Reed also have positions at MEP.

19.     Defendant NFI purports to be a Delaware corporation in an incumbency certificate submitted to Plaintiffs by MET's attorneys, Jones Walker. On information and belief, NFI is not listed as a corporation by the Delaware Secretary of State's office. NFI is resident and does business in New York, and has an address located at c/o Metropolitan Equity Partners LLC, 70 East 55th Street, 15th Floor, New York, NY 10022. Reed owned 100% of NFI as of the date of the Global Settlement Agreement, November 30, 2012; on information and belief, defendant Reed currently owns approximately 88% of NFI on a fully diluted basis. On information and belief, NFI is not a Michigan resident.

20.     Defendant NE Fuel is an Ohio corporation, doing business in New York and having an address located at c/o Metropolitan Equity Partners LLC, 70 East 55th Street, 15th Floor, New York, NY 10022, and another business address in Gallipolis, Ohio. NE Fuel is an Ohio and possibly also a New York resident for diversity purposes. Defendant NFI owns 100% of NE Fuel. NFI is not a Michigan resident.

**The Global Settlement Agreement**

21.     In 2011 and 2012, the parties hereto and their predecessors and affiliates and agents had been involved in various transactions involving the purchase of leases for oil/gas properties. Multiple disputes arose between the parties relating to, among other things: (i) the management, operation and capital requirements of Reed (which prior to entering into a settlement agreement at the end of November 2012 was owned approximately 39-40% by SGM, and 52-54% by MET13 and MEP); (ii) other conduct by the Lisiak Parties, inclusive of conduct by their agents, and by other persons or entities that were acting by, through, under, or in concert

with the Lisiak Parties; (iii) the rights, obligations, and liabilities of the Lisiak parties, inclusive of rights, obligations, and liabilities of their agents, and of other persons or entities acting by, through, under, or in concert with the Lisiak Parties; (iv) other conduct by SGM, inclusive of conduct by SGM's agents, and by other persons or entities that were acting by, through, under, or in concert with SGM; (v) the rights, obligations, and liabilities of SGM, inclusive of rights, obligations, and liabilities of SGM's agents, and of other persons or entities acting by, through, under, or in concert with SGM.

22.     To resolve and settle any and all of their disputes, expressly inclusive of all known and all unknown disputes whether foreseeable or unforeseeable, the Lisiak Parties and the SGM Parties entered into a global settlement agreement, dated as of November 30, 2012, (as amended, the "Global Settlement Agreement").

23.     Pursuant to the Global Settlement Agreement, among other things, SGM transferred its ownership interest in Reed to certain Lisiak Parties, and Lisiak Parties agreed to make specified payments to SGM, including -- among other things -- monthly payments of $10,000, and an interest in MET13 that would result in a $2.5 million payment on the sale of certain properties.

24.     The parties also agreed to other important provisions in the Global Settlement Agreement, some of which include requirements that SGM be notified of any oral or written offers on specified property; payments to SGM by Reed; the grant and recording by Reed and Lisiak Parties to SGM (and another entity) of overriding royalty interests on specified oil and gas leases; a non-disparagement clause; and issuance of mutual releases, which released not just SGM and Mr. Featherly, but all "SGM Released Parties," a term broadly defined to include all entities that were agents of, or which acted under or in concert with SGM or Mr. Featherly.

Lisiak and the other Defendants (i.e., the Lisiak Parties) have: breached all of these provisions of the Global Settlement Agreement, outright admitted certain of the breaches, and failed and refused to cure their breaches despite repeated demand.

25.     The Global Settlement Agreement consists of a document entitled Global Settlement Agreement, and exhibits A through G to the Global Settlement Agreement, which exhibits were expressly made part of the Global Settlement Agreement. Exhibit A to the Global Settlement Agreement is the SGM Fee Agreement (the "New SGM Fee Agreement" to avoid confusion with the former SGM fee agreement which this replaces). Other exhibits include lists of oil and gas acquisition conveyances affected by the Global Settlement Agreement (exhibits B-1 and B-2 to the Global Settlement Agreement); a list of prospective SGM Exit-Buyers (exhibit C); lists of oil and gas acquisition contracts pertaining to the "Caywood Group Properties" and "MNW Group Properties" (exhibits D-1 and D-2 thereto, respectively); lists of oil and gas conveyances constituting affected "Anderson Deep Rights" and "Affected Anderson Shallow Rights" (exhibits E-1 and E-2, respectively); the First Amended and Restatement Partnership Agreement of MET13, dated as of May 31, 2012, (exhibit F thereto); and the Limited Liability Company Agreement of Reed as of January 4, 2012, (exhibit G thereto).

26.     A minor one-page amendment ("Amendment No. 1) to the Global Settlement Agreement was entered into as of December 1, 2012. The only substantive change sought by Amendment No. 1 was to increase the period of time from ten (10) business days to twenty (20) business days from November 30, 2012, for MET13 and Reed to grant to SGM the "New SGM ORRI," a grant and recording of overriding royalty interests in certain oil and gas leases. As detailed below, precisely because MET13 and Reed still have not granted the New SGM ORRI, despite repeated demand, this change is largely irrelevant -- other than minimal

effects on calculation of interest due. It merely means that MET13 and Reed have been in breach of this provision since December 28, 2012, rather than December 14, 2012.

27.     In retrospect, the real reason for Amendment No. 1, and the only other change effected by Amendment No. 1, was because Lisiak wished to re-name the Global Settlement Agreement the "Restructuring Plan Agreement." Lisiak sought this non-substantive change, on information and belief, so as not to alert his investors, including investors in MET13, that SGM and Mr. Featherly had significant claims against Lisiak Parties, including for their mismanagement of Reed, and for other breaches of contract.

28.     This Complaint nonetheless will use the term Global Settlement Agreement throughout, because "Global Settlement Agreement" is more descriptive and more accurate; "Global Settlement Agreement" is the term used throughout in the Global Settlement Agreement and in the New SGM Fee Agreement, and thus avoids any confusion; and because it is entirely evident now, more than seven months later, that Lisiak Parties entered into Amendment No. 1 fraudulently, and without any intention of granting the New SGM ORRI on December 28, 2012.

29.     A true and accurate copy of the Global Settlement Agreement, together with Amendment No.1 thereto ("Global Settlement Agreement"), is attached as <u>Exhibit 1</u> to this Complaint. (Given the length of the Global Settlement Agreement, and solely for ease of reference, this copy of the Global Settlement Agreement has been Bates stamped on the lower right hand corner of all pages; for the avoidance of doubt, the Bates stamps are not part of the Global Settlement Agreement.)

30.     The Global Settlement Agreement constitutes a valid, binding and enforceable agreement between the parties thereto.

31.     MET13, MEP, Reed, NFI and NE Fuel each represented and warranted in Sections 9(d) and/or 10(d) of the Global Settlement Agreement that the Global Settlement agreement is a valid, binding and enforceable agreement.

32.     The Lisiak Parties have repeatedly breached, failed, and refused to fulfill their obligations as set forth in the Global Settlement Agreement.

33.     All liability for breaches of the Global Settlement Agreement by MET13 are enforceable as against METGP, as general partner of that limited partnership.

<u>COUNT ONE</u>
**(Breach of Contract by Reed at Direction of Lisiak:**
**Failure to Pay Monthly Service Fees)**

34.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 - 33 of this Complaint with the same force and effect as if fully set forth herein.

35.     One of the more obvious breaches of the Global Settlement is Reed's failure, at the direction of Lisiak, to pay SGM required monthly service fees of $10,000 per month. These monthly fees are defined as "Compensation."

36.     While not a large amount of money relative to other provisions of the Global Settlement Agreement, these breaches in relation to the payment of Compensation perhaps most obviously demonstrate Lisiak Parties' contempt for and intent to ignore the Global Settlement Agreement, given Lisiak's outright and repeated admissions that Reed owes the monthly payments, and Lisiak's outright and repeated refusal to make those payments, both after informal demand, and after SGM served formal notice of breach, not once, but twice.

37.     Moreover, Lisiak's emails responding to these breaches of contracts (i) set forth an actual controversy as to SGM Parties' continuing duties to perform Services as defined in the New SGM Fee Agreement, for which declaratory judgment is sought in Count Two of this

Complaint, because payment of Compensation to SGM Parties is expressly a condition precedent to the performance of those Services by the SGM Parties; and (ii) admit and specifically refer to other breaches of the Global Settlement Agreement and New SGM Fee Agreement by Lisiak, Reed, and other Lisiak Parties which, for the sake of organization and logic, are dealt with in other Counts of this Complaint.

38.     The New SGM Fee Agreement, between Reed and SGM and (as to Section 1, Mr. Featherly and MET13) is part of the Global Settlement Agreement, and is exhibit A thereto. Like the Global Settlement Agreement, the New SGM Fee Agreement is dated as of November 30, 2012, (the "New SGM Fee Agreement").

39.     In relevant part, Section 2 of the New SGM Fee Agreement provides that Reed is required to pay SGM "Compensation" for services in the amount of $10,000 per month, which Compensation is to be paid in advance, on the first business day of each month:

> In exchange for the services described in Section 1 of this Agreement, Reed will (i) pay SGM the sum of Ten Thousand Dollars ($10,000) per month (the "Compensation") payable in advance on the first business day of each month during the term of this Agreement . . . .

40.     The Compensation was payable to SGM regardless of whether or not Reed sought for SGM to perform services. Section 3 of the New SGM Fee Agreement provides that "fees and other compensation contemplated by this Agreement shall be payable by Reed regardless of the extent of services requested by Reed pursuant to this Agreement, and regardless of whether or not Reed requests SGM to provide such Services."

41.     In turn, Section 15 of the New SGM Fee Agreement provides that SGM has the right to collect the Compensation indefinitely, with this right only terminating "90 days following the consummation of an Exit Event."

42.     The Compensation under the New SGM Fee Agreement was negotiated, in part, to replace SGM's rights under a prior fee agreement, pursuant to which SGM had been entitled to a monthly payment of $5,000 per month in perpetuity with no termination of this right at all, even after the consummation of an Exit Event.

43.     An Exit Event involves the disposition of certain specified properties. Other provisions of the Global Settlement Agreement provide for the payment of very substantial sums of money ($2.5 million or more) to SGM in connection with such dispositions.

44.     On information and belief, there has been no Exit Event as of the date of this Complaint.

45.     Reed deliberately and willfully failed to pay the $10,000 per month Compensation to SGM for the months of April, May, June and July, and is anticipatorily breaching and repudiating its obligations to make future monthly payments of $10,000 per month.

46.     Reed has both breached the New SGM Fee Agreement, and the Global Settlement Agreement of which the New SGM Fee Agreement is an integral part.

47.     The breaches by Reed were authorized and directed by its Chairman, Defendant Lisiak.

48.     SGM repeatedly requested timely payment of the monthly Compensation payments from Reed, and its chairman, Lisiak.

49.     Reed has consistently breached its obligations under the Global Settlement Agreement, including its obligations under the New SGM Fee Agreement that is part of the Global Settlement Agreement.

50.     Even though Reed did eventually pay SGM the Compensation for January, February and March of 2013, Reed did not pay the Compensation "in advance on the first business day" of such months as required by the New SGM Fee Agreement.

51.     Rather, SGM was forced to send demands to Reed for the Compensation due in January, February and March of 2013 before Reed paid that Compensation.

52.     And Reed has not paid any Compensation since March 2013, including for April 2013, May 2013, June 2013, and July 2013, despite repeated demands and the eventual service of formal notices of default.

53.     SGM repeatedly told Lisiak of these breaches and failures to pay Compensation by Reed, to no avail.

54.     Finally, SGM sent Reed a formal default notice, dated May 3, 2013, (the "First Default Notice").

55.     Attached as Exhibit 2 to this Complaint is a true and accurate copy of the First Default Notice.

56.     Lisiak, on behalf of Reed, sent SGM a response to the First Default Notice, dated May 6, 2013, (the "Default Response Letter").

57.     Attached as Exhibit 3 to this Complaint is a true and accurate copy of the Default Response Letter.

58.     In the Default Response Letter, Lisiak admits on behalf of Reed that Reed has not paid SGM the required Compensation.

59.     In the Default Response Letter, Lisiak does not deny that the Compensation is due. Rather, he claims that Reed has not paid SGM the Compensation because "Reed is simply in a mode to conserve cash."

60.     At no time has Reed or Lisiak ever claimed that the Compensation is not due to SGM.

61.     On information and belief, Reed has cash on hand sufficient to pay SGM, but insufficient cash to pay all of its debts.

62.     Reed is technically insolvent: it lacks sufficient capital to pay all of its debts when they become due, and Reed has not been paying undisputed debts owed to its creditors on a timely basis when debts become due.

63.     SGM sent Reed a formal notice of continuing default on June 12, 2013, (the "Second Default Notice").

64.     Attached as Exhibit 4 to this Complaint is a true and accurate copy of the Second Default Notice.

65.     On July 10, 2013, Lisiak and Mr. Featherly had an email exchange relating to certain of Reed's numerous defaults under the Global Settlement Agreement, including Reed's failure and refusal to pay Compensation (the "Reed Default Email Exchange").

66.     Attached as collective Exhibit 5 to this Complaint are true and accurate copies of the emails constituting the Reed Default Email Exchange.

67.     In the Reed Default Email Exchange, Lisiak again acknowledges that Reed owes SGM the Compensation.

68.     In addition to the Compensation, SGM is entitled to receive interest on the Compensation at the rate of 10% APR, pursuant to Section 7 of the New SGM Fee Agreement.

69.     Reed and the Lisiak Parties consistently have deliberately breached and anticipatorily breached the Global Settlement Agreement.

70.     Reed and Lisiak intend to continue to breach and violate the New SGM Fee Agreement that is part of the Global Settlement Agreement.

71.     As more fully set forth below, the Lisiak Parties have willfully breached multiple other obligations under the Global Settlement Agreement, and have anticipatorily breached their obligations under the Global Settlement Agreement.

72.     SGM seeks a lis pendens, liening on Reed's assets, including on Reed's oil and gas leases in Washington County Ohio, to secure the payment of the Compensation and the interest that is currently due and owing SGM and all future Compensation and interest and other substantial sums that are or shortly will be due and owing SGM under the New SGM Fee Agreement and the Global Settlement Agreement.

73.     SGM also seeks a declaration that Reed is insolvent, prefatory to SGM seeking appointment of a receiver for Reed, on account of Reed's actual failure to pay undisputed debts of its creditors when due, and/or on account of Reed lacking sufficient capital to pay its debts.

74.     SGM also seek monetary damages, in an amount to be determined at trial, for Reed's breaches and anticipatory breaches of the New SGM Fee Agreement and the Global Settlement Agreement.

## COUNT TWO
### (Declaratory Judgment: Plaintiffs Owe No Obligations to Perform Any Services Because of Defendants' Breaches of the Global Settlement Agreement and the New SGM Fee Agreement, Including Reed's Failure to Pay Compensation)

75.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-74 of this Complaint with the same force and effect as if fully set forth herein.

76.     On behalf of Reed and MET13, Lisiak has repeatedly claimed to SGM Parties that the SGM Parties are still required to provide specified "Services" to Reed as set forth in Section 1 of the New SGM Fee Agreement.

77.     Lisiak repeatedly claims that, despite Reed's failure to pay Compensation, SGM Parties still owe Services, including in particular an obligation to provide Reed a right of first refusal on all additional opportunities with respect to which SGM or Mr. Featherly, or any of their respective affiliates, enter into a written contract for the purchase, lease, or sublease of "Deep Rights," i.e., oil and gas conveyances for mineral rights at and below the top of the Utica Shale Formation, in Washington County, Ohio. ("Shallow Rights" are similar rights starting at the surface and going to the top of the Deep Rights. Loosely, and solely to assist laymen to visualize the difference between Shallow and Deep Rights, Deep Rights in this area of Ohio typically start approximately 2,500 feet below the surface.)

78.     SGM Parties at all times complied with their obligations to provide Services during the period that Reed paid Compensation pursuant to the New SGM Fee Agreement.

79.     Reed has not paid Compensation since the Compensation paid for March 2013.

80.     Lisiak on behalf of Reed and MET13 has asserted and asserts, both to SGM Parties, and to non-parties, including investors in Reed and MET13, that SGM and Mr. Featherly currently owe Reed and MET13 a right of first refusal and other Services specified in the New SGM Fee Agreement.

81.     SGM and Mr. Featherly assert and have asserted that Reed's failure and refusal to pay Compensation eliminates any obligation for them to provide the right of first refusal or any other Services specified in the New SGM Fee Agreement.

82.     SGM Parties have advised Lisiak that they no longer have to provide Services, including the referenced right of first refusal, based on (i) the express provisions of Section 1(f) of the New SGM Fee Agreement, which specifically provide that "Reed's payment of the Compensation to SGM shall be deemed a condition precedent to SGM's and Richard Featherly's obligations . . . ," and (ii) general principles of contract law.

83.     Nonetheless, Lisiak, on behalf of Reed and MET13, continues to claim and to assert that SGM Parties remain obligated to provide a right of first refusal.

84.     There is a present and actual controversy as to the rights of the parties under the Global Settlement Agreement and the New SGM Fee Agreement with regard to SGM's and Mr. Featherly's and their affiliates' obligations to provide Services.

85.     SGM and Mr. Featherly seek a declaratory judgment that, because of Reed's and Lisiak's and MET13's repeated, willful, and continuing breaches of the Global Settlement Agreement, as detailed in this Count and in other Counts of this Complaint; and because of Reed's and Lisiak's violations of New SGM Fee Agreement; and because of Reed's failure to satisfy a condition precedent (payment of the Compensation), SGM and Mr. Featherly do not owe any Services, and in particular SGM, Mr. Featherly, and their affiliates are not required to provide Reed or MET13 or any other Lisiak Party the right of first refusal as to any additional opportunities, including any additional opportunities in Deep Rights in the Utica Shale Formation in Washington County, Ohio.

86.     SGM Parties also seek a declaratory judgment that Reed is insolvent.

## COUNT THREE
### (Breach of Contract -- Failures of Reed, NFI and NE Fuel to Grant and Record Overriding Royalties in Favor of SGM and in Favor of MNW Energy LLC, and Concurrent Failures to Pay Attorneys' Fees and Title Work Expenses)

87.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-86 of this Complaint with the same force and effect as if fully set forth herein.

88.     The Global Settlement Agreement, as amended, including Section 5(a) & (b) thereof, requires Reed, NFI and NE Fuel to grant and record overriding royalty interests ("ORRIs") in favor of SGM on all of the Reed Acreage (whether owned by Reed, NFI, and/or NE Fuel) except for a few properties of which Reed, NFI, and/or NE Fuel did not own at least an 81% net revenue interest (the "New SGM ORRI") within 20 business days from November 30, 2012, (i.e., by no later than December 28, 2012).

89.     The Global Settlement Agreement, including Section 6 thereof, requires Reed to grant and record an ORRI on certain oil and gas mineral rights that are part of the acreage position known as the Caywood Group Properties (the "Caywood Group Properties") to SGM (the "Retained SGM ORRI") and to grant and record a similar ORRI in favor of MNW Energy LLC (the "MNW ORRI") simultaneously with the date or dates that Reed takes title to such Caywood Group Properties.

90.     In furtherance of the Global Settlement Agreement, SGM assigned to Reed purchase and sale agreements representing approximately 1,175 acres of Caywood Group Properties via three separate assignment and assumption agreements, dated January 7, 2013, January 16, 2013, and March 6, 2013, respectively, each between SGM and Reed (collectively, the "Caywood Assignment Agreements" and each a "Caywood Assignment Agreement").

91.     A true and accurate copy of each of the Caywood Assignment Agreements is attached to this Complaint as Exhibits 6, 7, and 8, respectively.

92.     Each of the Caywood Assignment Agreements requires Reed to grant and record (i) the Retained SGM ORRI on the date that Reed takes title to the Caywood Group Properties described in the exhibit attached to the applicable Caywood Assignment Agreement and (ii) the MNW ORRI within ten business days from the date that Reed takes title to the Caywood Group Properties described in the exhibit attached to the applicable Caywood Assignment Agreement.

93.     Reed took title to the Caywood Group Properties that were the subject of the Caywood Group Assignment Agreements on January 8, 2013, January 16, 2013, and March 7, 2013, respectively.

94.     The New SGM ORRI, the Retained SGM ORRI and the MNW ORRI, are collectively referred to as the "Required ORRIs."

95.     SGM repeatedly has demanded that Reed, NFI, and NE Fuel comply with their obligations under the Global Settlement Agreement, and pursuant to the Caywood Group Assignment Agreements, to grant and record the Required ORRIs.

96.     Lisiak, on behalf of Reed, NFI, and NE Fuel, expressly acknowledged the obligations of Reed, NFI, and NE Fuel to grant and record the Required ORRIs, and their failure to do so, including in the Default Response Letter (Exhibit 3, supra) and the Reed Default Email Exchange (Exhibit 5, supra).

97.     Reed, NFI, and NE Fuel, at the direction of Lisiak and other Lisiak Parties, willfully and deliberately breached the Global Settlement Agreement, and the terms of

the Caywood Group Assignments, by failing to grant and record the Required ORRIs, despite due demand.

98.     Lisiak provides no valid excuse for Reed, NFI and NE Fuel breaching their legal obligations to SGM to record the Required ORRIs.

99.     The only -- invalid -- excuses offered by Lisiak for these breaches include "an effort to be efficient" with the "legal budget" (claimed in Exhibit 3 supra, the Default Response Letter) and unspecified and non-existent "logistical issues" (claimed in Exhibit 5 supra, the Reed Default Email Exchange). None of these excuses provides a valid legal excuse for any of these continuing defaults.

100.    As of the date of this Complaint, the Required ORRIs have not been granted and recorded by Reed, NFI or NE Fuel.

101.    Further, pursuant to the Global Settlement Agreement, including Section 6(f) thereof, Reed is responsible for and specifically obligated to pay the reasonable attorneys' and title work fees and costs of Steptoe & Johnson ("S&J"), Complete Title Solutions, and any other third parties retained by Reed, MEP, or MET13 to perform legal or title work in connection with Caywood Group Properties and other specified property.

102.    Reed contractually was made responsible to pay such attorney and title work fees so that no liens are placed on any of these properties by S&J, Complete Title Solutions, or other title company or law firm, and so as to avoid any possibility that any title company or attorney or law firm might seek to assert claims as against SGM.

103.    On information and belief, Reed also has breached the Global Settlement Agreement by failing to pay the attorneys' and title work fees required to be paid pursuant to Section 6(f) of the Global Settlement Agreement, thereby exposing SGM to potential claims

from S&J, Complete Title Solutions, and other law firms or title services, and the risk of a lien being placed on the relevant properties.

104.    Reed's breaches and failure to record the MNW ORRI have also exposed SGM to potential claims from MNW Energy LLC.

105.    The continuing willful and deliberate failures of Reed, NFI and NE Fuel to grant and record the Required ORRIs, and the continuing willful and deliberate failure of Reed to pay attorneys' fees and title fees to S&J and to Complete Title Solutions and other law firms or title companies not only breach the Global Settlement Agreement, but constitute further proof that Lisiak Parties have no intention of complying with the Global Settlement Agreement, and are both breaching and anticipatorily breaching and repudiating all of their obligations under the Global Settlement Agreement.

106.    The failure of Reed to grant and record the Retained SGM ORRI and the MNW ORRI not only breaches the Global Settlement Agreement, it also constitutes a breach of each of the three Caywood Assignment Agreements, which were each executed in furtherance of the Global Settlement Agreement.

107.    SGM seeks an order requiring Lisiak, Reed, NFI, and NE Fuel to cause all of the Required ORRIs (the New SGM ORRI, the Retained SGM ORRI, and the MNW ORRI) to be granted and recorded.

108.    SGM also seeks to have Reed, NFI and/or NE Fuel pay SGM the royalties SGM would have earned on the New SGM ORRI if Reed, NFI and/or NE Fuel had timely granted and recorded the New SGM ORRI, together with interest, costs, and attorneys' fees.

109.    SGM has suffered damages, in an amount to be determined at trial, in a principal amount that exceeds $75,000, and is also entitled to payments or reimbursements of its

costs and attorneys' fees, plus interest, on account of these contractual breaches by Lisiak, Reed, NFI, and NE Fuel.

## COUNT FOUR
### (Breach of Contract: Violation of General Release Provisions; Inducing Claims by Third Parties)

110. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-109 of this Complaint with the same force and effect as if fully set forth herein.

111. The Global Settlement Agreement sets forth, in Section 11 thereof, a very broad release of each of the parties and each of their "successors, assigns, subsidiaries, affiliates, members, managers, shareholders, officers, directors, employees **and agents and any and all persons or entities acting by, through, under or in concert with any of them**." (emphasis supplied.) The Global Settlement Agreement defines these entities, and their agents and persons acting by, through, under, or in concert with them, as "SGM Released Parties" (which includes, among others, SGM and Mr. Featherly), "MET Released Parties" (which includes, among others, MEP, MET13, and Lisiak), and "Reed Released Parties" (which includes, among others, Reed, NE Fuel, and NFI).

112. The releases were broadly drafted both in how Released Parties was defined, and also in terms of the scope of the releases, which were to include "any and all actions, suits, prosecutions, claims, liabilities, damages or other legal or equitable remedies, whether known or unknown, foreseeable or unforeseeable, arising or claimed to arise out of any act or failure to act of any [SGM, MET, or Reed] Released Party from the beginning of time to the date of the execution of this Agreement."

113.    In addition to the releases, the parties also mutually agreed "not to induce or attempt to induce the commencement of any action against any … Released Party for any claim or cause of action of the type released under the terms of this Agreement."

114.    In Section 12 of the Global Settlement Agreement, the parties also exchanged mutual and broad indemnifications from any claim, demand, action, suit, resulting judgment, costs, disbursements and expenses (including, without limitation, reasonable attorneys'' fees and expenses) of any kind or nature whatsoever, resulting from, relating to or founded upon any breach of the Global Settlement Agreement, or any claims subject to the releases provided in Section 11 of the Global Settlement Agreement.

115.    Notwithstanding the broad releases and indemnifications in the main Global Settlement Agreement, and the indemnifications set forth in the New SGM Fee Agreement, Lisiak and his agents (including Fred Ganning), and the Lisiak Parties have violated the terms of this broad release and indemnification, by asserting claims as against SGM Released Parties; by threatening litigation as against SGM Released Parties; and by encouraging others, including other Lisiak Parties and third-party investors in MET13 to litigate or assert claims as against SGM Released Parties.

116.    Some of the SGM Released Parties against which Lisiak Parties are threatening litigation and encouraging others to litigate against or assert claims against include: Regent Private Capital LLC ("Regent") and its members and officers, including but not limited to Lawrence Field.

117.    Starting in early February 2011, both Regent and Mr. Field were agents of SGM, as both Regent and Mr. Field were consultants and advisors to SGM. Both Regent and Mr. Field also qualified as SGM Released Parties because both Regent and Mr. Field acted by,

through, under, or in concert with SGM. As such, Regent (and its members and officers) and Mr. Field qualify as SGM Released Parties, and are therefore released in the Global Settlement Agreement, and entitled to the protections and indemnifications as set forth in the Global Settlement Agreement.

118.    Mr. Field and Regent were agents of SGM, or acted by, through, under, or in concert with SGM, in connection with, among other things, the contemplated acquisition, development, and capital raise for acquisition and development of: (i) certain oil and gas mineral rights (the "Anderson Deep Rights"), which typically began at 2,500 feet below the surface, and deeper, belonging to Mr. Bobby B. Anderson ("Mr. Anderson"), Mrs. Marjorie Anderson ("Mrs. Anderson"), Anderson Drilling Co., Ace Gas and Oil Co., Inc., Crude Oil Marketing, Inc., and NE Fuel (collectively, the "Anderson Group") and (ii) 100% of the common stock of a producing oil and gas company known as NE Fuel, from Mr. Anderson and Mrs. Anderson, together with certain other oil and gas mineral rights starting at the surface of the Earth to the top of the Deep Rights that belonged to the Anderson Group (the "Anderson Shallow Operation"). The Anderson Deep Rights and the Anderson Shallow Operation are collectively referred to as the "Anderson Deal."

119.    Mr. Field on behalf of Regent executed a consulting agreement for the Anderson Deal, dated March 1, 2011, (the "Regent-SGM Consulting Agreement"). The Regent-SGM Consulting Agreement was counter-executed by Mr. Featherly, as president of Syndicated GEO Management Inc., the predecessor to SGM.

120.    SGM is the successor to Syndicated GEO Management Inc. The change from a corporation to a limited liability corporation was accomplished for tax and other purposes, effective April 5, 2011, shortly after the Regent-SGM Consulting Agreement was

executed. Subsequent to that change, Regent continued to perform services under the Regent-SGM Consulting Agreement, but for SGM and not its inactive predecessor Syndicated GEO Management Inc.

121.    A true and accurate copy of the Regent-SGM Consulting Agreement is attached as Exhibit 9 to this Complaint.

122.    Regent's and Mr. Field's services to SGM included, but were not limited to, (i) assisting SGM in preparing a development plan for the Anderson Deal, (ii) assisting SGM and others in updating financial projections for the Anderson Deal based on current oil and gas prices, and (iii) assisting SGM in preparing a PowerPoint presentation for the Anderson Deal (collectively, the "Anderson Deal Marketing Package").

123.    A true and accurate copy of the Anderson Deal Marketing Package is attached as Exhibit 10 to this Complaint.

124.    Regent's and Mr. Field's services to SGM also included introducing SGM to potential investors for the Anderson Deal and presenting the Anderson Deal Marketing Package to such potential investors on behalf of SGM, and negotiating with those potential investors on behalf of SGM.

125.    Some of the potential investors that Regent and Mr. Field introduced to SGM included Lisiak and MEP.

126.    Regent and Mr. Field, acting on behalf of SGM, presented the Anderson Deal Marketing Package to Lisiak and MEP.

127.    Lisiak expressly recognized that Regent was acting on behalf of SGM, in multiple letters, and in particular during several months of negotiating the term sheet eventually entered into by and between SGM and MEP. For example, by letter dated April 23, 2011, and via

emails, Lisiak and MEP sent a proposed term sheet to SGM "c/o Lawrence Field, Regent Private Capital," which Lisiak and MEP sent to Mr. Field at Regent, not directly to SGM.

128.    Lisiak revised the proposed April 23, 2011, letter and proposed term sheet with SGM and again sent it, via email, on April 25, 2011, to Mr. Field at Regent, stating "Kindly see the attached. I corrected a few typos and clarified a few points. We are signed off on this from the Metropolitan side and ready to discuss whether or not this is acceptable to Regent in its current form." In short, Lisiak and MEP were expressly acknowledging that Regent was acting for SGM in negotiating the term sheet.

129.    True and correct copies of the original draft April 23, 2011 letter, the April 25, 2011 email from Lisiak, and the revised April 23, 2011 letter to SGM in care of Regent are annexed hereto as collective Exhibit 11.

130.    Thereafter, Lisiak sent to Mr. Field and Regent another revision of the proposed letter and term sheet with SGM, dated May 2011.

131.    A true and correct copy of an email from Lisiak to Mr. Field dated April 29, 2011, and a revised letter to SGM in care of Mr. Field at Regent dated May 1, 2011, (on the first page) and April 23, 2011, (on the second page) are annexed hereto as collective Exhibit 12.

132.    This practice of MEP and Lisiak negotiating with SGM through Regent and Mr. Field continued for several months.

133.    Eventually, MEP and SGM entered into a term sheet, some months later, that had been in part negotiated for SGM by its agents, Mr. Field and Regent.

134.    In short, there is no dispute that SGM acted "by, through, under or in concert with" Regent and Mr. Field, nor is there any dispute that Mr. Field and Regent were SGM's "agents."

135.    Regent and Mr. Field constitute "SGM Released Parties" as that term is defined in the Global Settlement Agreement

136.    Lisiak and the Lisiak Parties know that Regent and Mr. Field are SGM Released Parties.

137.    Even though Regent and Mr. Field are SGM Released Parties, Lisiak and Lisiak Parties have violated the Global Settlement Agreement by asserting claims against Regent and Mr. Field, and by encouraging others to assert claims against Regent and Mr. Field.

138.    Lisiak on behalf of MEP, MET13, and other Lisiak Parties sent two letters to Regent and Mr. Field, one on June 4, 2013, and one on June 28, 2013 (collectively the "Lisiak Letters"), each letter expressly accusing Regent and Mr. Field (and other members of Regent) of engaging in a "pattern of deceit, fraud and misrepresentation" to the detriment of the Lisiak Parties with respect to the Anderson Deal, and demanding payment from Regent and Mr. Field for the alleged damages caused to the Lisiak Parties because of the Anderson Deal.

139.    Lisiak and Fred Ganning, who is an investor in MET13 and a Board Member of Reed, have also demanded that Charles Stephenson, a member of Regent, and the father-in-law of Mr. Field, spend some $17 million to purchase oil and gas properties, including the Anderson Deal (both Anderson Deep Rights and the Anderson Shallow Operation) acquired by Lisiak Parties, threatening that Lisiak and the Lisiak Parties, or investors in MET13 will sue Lawrence Field and Regent for their conduct and actions.

140.    As discussed in detail below, there is no factual basis to sue Mr. Field.

141.    Lisiak and Ganning also threatened to ruin the reputations of Mr. Stephenson and Mr. Field by telling prospective investors in their companies of supposed bad

acts by Regent and Mr. Field relating to the Anderson Deal and other acquisitions by Lisiak Parties.

142.    Lisiak and Ganning repeatedly have expressly characterized their threats to Regent, Mr. Field, and Mr. Stephenson, both in conversations with Mr. Stephenson and Mr. Field, and in conversations with third parties, including Mr. Featherly, as "greenmail."

143.    More accurately, Lisiak's and Ganning's and Lisiak's Parties' conduct constitutes blackmail, and would be actionable by Messrs. Stephenson and Field under the legal doctrines of prima facie tort and tortious interference with prospective economic relations and prospective contractual rights. Blackmail is defined as obtaining property by extortion, or seeking to obtain property by extortion, by obtaining and seeking to obtain delivery of property by threatening that, if the property is not so delivered, he will expose a secret or publicize an asserted fact, whether true or false, that would tend to subject some person to hatred, contempt, or ridicule, or will perform any other act which is calculated to harm another person materially with respect to his health, safety, business, calling, career, financial condition, reputation, or personal relationships. See N.Y. Penal Law § 155.05.

144.    True and accurate copies of the two Lisiak Letters are attached to this Complaint as collective Exhibit 13.

145.    Mr. Stephenson was a member of Regent, and solely in that capacity had authorized Mr. Field to conduct business for Regent, including representing SGM in connection with the Lisiak Parties. However, as Lisiak, the Lisiak Parties, and Mr. Ganning know, Mr. Stephenson had absolutely no involvement in any transaction with any of the parties hereto. Indeed, until receiving these recent threats from Lisiak and then Ganning, Mr. Stephenson had

never spoken with either Lisiak or Ganning; Mr. Stephenson had never met with any of the Lisiak Parties; and Mr. Stephenson had never even received an email from Lisiak or Ganning.

146.    All of the claims by Lisiak and Ganning are invalid as a matter of law, and as a matter of fact. As a matter of law, precisely because Regent and Mr. Field constitute SGM Released Parties, all claims against Regent and Mr. Field were released by the Lisiak Parties pursuant to Section 11 of the Global Settlement Agreement.

147.    Precisely because Regent and Mr. Field are SGM Released Parties, Lisiak Parties are in violation of the Global Settlement Agreement both for asserting claims and threatening litigation as against Regent and Mr. Field, and for encouraging others to assert claims and bring litigations as against Regent and Mr. Field.

148.    Mr. Field, on behalf of Regent, Regent's former members, and himself, has requested that SGM defend both Regent and Mr. Field from the accusations, claims and demands set forth in the Lisiak Letters, because both Regent and Mr. Field were acting on behalf of SGM on the Anderson Deal and were in fact SGM's agents in dealing with Lisiak, MEP, and MET13 with respect to the Anderson Deal, which closed on or about January 4, 2012, and Lisiak's and Ganning's and Lisiak Parties' allegations against Regent and Mr. Field largely focus on Lisiak Parties' closing on the Anderson Deal, and Lisiak and Ganning effectively are seeking for Mr. Stephenson to buy them out of the Anderson Deal.

149.    Lisiak's and Lisiak Parties' breaches of Section 11 of the Global Settlement Agreement are entirely consistent with Lisiak Parties' pattern and practice of ignoring, breaching, and repudiating the Global Settlement Agreement.

150.    The false accusations against Regent and Mr. Field in the Lisiak Letters damage SGM's relationship with Mr. Field and companies with which he is associated.

151.    SGM requests a declaratory judgment that (i) Mr. Field and Regent are each SGM Released Parties and that (ii) Lisiak Parties have breached Section 11 of the Global Settlement Agreement.

152.    Quite aside from the fact that all of the claims by the Lisiak Parties were already waived in the Global Settlement Agreement, the allegations against Mr. Field and Regent simply are not true. To the contrary, Lisiak, MEP, and Lisiak Parties had knowledge of all facts that they claim Regent or Mr. Field withheld, and Lisiak, MEP, and Lisiak Parties are responsible for all of the conduct of which they accuse Regent and Mr. Field.

153.    The uncontestable facts -- supported by uncontestable documentary evidence -- set forth below both exonerate Regent and Mr. Field from any claim of fraud or misconduct, and prove that Lisiak Parties deliberately withheld material facts from investors in MET13, and provided materially false and misleading information to those investors. Lisiak Parties' claims as against Mr. Field and Regent evidently constitute an attempt to excuse their own poor investment decisions, and to blame someone else (anyone else) for Lisiak Parties' breaches of fiduciary duties that they owed to their investors.

154.    Lisiak Parties' allegations, as set forth in the Lisiak Letters, fall into the following five categories, (i) Regent and Mr. Field purportedly fraudulently represented that they were responsible to review and did review the Anderson Deal on behalf of MEP or other Lisiak Parties; (ii) Regent and Mr. Field purportedly fraudulently prepared the Anderson Marketing Materials; (iii) Regent and Mr. Field purportedly fraudulently redacted material information from a preliminary report prepared by Bayswater, a third party expert, which redactions purportedly misled Lisiak Parties; (iv) Lisiak Parties' acquisition of the Anderson Shallow Rights purportedly resulted from misconduct by Regent and Mr. Field; and (v) the Lisiak Parties have

not succeeding in selling the Anderson Deep Rights purportedly because of misconduct or nonfeasance by Regent and Mr. Field.

**Vetting of the Anderson Deal**

155.    The "Anderson Deal," which closed on January 4, 2012, was the deal presented to MEP by SGM through its agents, Regent and Mr. Field. In brief, the Anderson Deal consisted of (i) the purchase of Anderson Deep Rights, and (ii) a Stock Purchase Agreement, pursuant to which certain Anderson Deep Rights and certain Anderson Shallow Rights might be acquired.

156.    Lisiak, in the Lisiak Letters, alleges that Regent and/or Mr. Field represented to Lisiak, MEP, MET13 and/or Reed that Regent and/or Mr. Field "fully vetted" the Anderson Deal and that Lisiak, MEP, MET13 and/or Reed relied on such representation when, on January 4, 2012, Lisiak, MEP, MET13 and/or Reed (as applicable): (i) executed the Reed Operating Agreement (a true and accurate copy of which is attached as exhibit F to the Global Settlement Agreement); (ii) authorized and/or executed the senior secured loan agreement between MET13 and Reed (the "MET13 Loan Agreement") in which MET13 provided Reed with an initial credit line of $27,000,000 (the "MET13 Credit Line") over-secured by a $100,000,000 first mortgage (the "$100,000,000 MET13 Mortgage") on all of Reed's assets; (iii) authorized Reed to draw down on the MET13 Credit Line; (iv) authorized Reed to assume the Anderson Deal; (v) authorized Reed to fund the option agreement to purchase the Anderson Deep Rights; and (vi) authorized Reed to fund some of the Regent Recommended Due Diligence (collectively, the "January 4, 2012 Reed Closing").

157.    A true and accurate copy of the MET13 Loan Agreement is attached as Exhibit 14 to this Complaint.

158.    A true and accurate copy of the final version of the $100,000,000 MET13 Mortgage is attached as Exhibit 15 to this Complaint. (The attached copy is not executed because MEP's counsel failed to circulate a closing binder, although the mortgage on file presumably is executed.)

159.    A true and accurate copy of the January 4, 2012, Reed Closing projected use of proceeds is attached as Exhibit 16 to this Complaint.

160.    In fact, neither Regent nor Mr. Field ever represented to the Lisiak Parties that Regent, Mr. Field or anyone else for that matter, had fully vetted the Anderson Deal, nor was it their responsibility to do so.

**The Anderson Deal Was Always Subject to Additional Due Diligence.**

161.    To the contrary, Regent and Mr. Field had always maintained and suggested to all parties that there was a significant amount of due diligence that needed to be completed on the Anderson Deal prior to any acquisition of the Anderson Deep Rights and/or the Anderson Shallow Operation.

162.    Regent and Mr. Field also repeatedly suggested that due diligence needed to be completed by qualified third parties (engineers, geologists, title researchers, and attorneys) and not by Regent or Mr. Field.

163.    Lisiak and MEP, as experienced fund managers, knew that due diligence should be completed before purchasing assets for a fund.

164.    Lisiak and MEP, as experienced fund managers, had the absolute and non-delegable duty to have due diligence completed by qualified experts before closing on a substantial purchase of assets for a fund.

165.    The due diligence that Regent and Mr. Field specifically suggested would be appropriate, both to their principals (SGM and Mr. Featherly) and to Lisiak and MEP included: (i) a detailed title review and report on all of the Anderson Deep Rights and the Anderson Shallow Operation (collectively, the "Title Due Diligence"); (ii) a GIS acreage map for both the Anderson Deep Rights and the Anderson Shallow Operation (neither of which could be accurately completed until after the Title Due Diligence was complete); (iii) the appointment of an operator for the Anderson Shallow Operation (the "Shallow Operator") and the execution of a joint operating agreement with such Shallow Operator; (iv) a well-by-well inspection of the Anderson Shallow Operation by the Shallow Operator; (v) an environmental Phase I Report on the Anderson Shallow Operation (the "Phase I Environmental Report"); (vi) an environmental survey on the gas gathering system (the "Gas System Environmental Survey"); (viii) usual and customary legal due diligence on NE Fuel (the "Legal Due Diligence"), and (ix) revised and updated development plans and financial projections for the Anderson Deal (the "Revised and Updated Development Plan & Financial Projections") to be prepared once the other due diligence items were completed (collectively, the "Regent Recommended Due Diligence").

166.    Mr. Featherly of SGM and Lisiak of MEP repeatedly discussed the Regent Recommended Due Diligence, and it was expressly recognized and stated and agreed that such due diligence constituted conditions precedent to closing on the Anderson Deal.

167.    On May 20, 2011, Lisiak sent an "investor briefing" to all of MEP's investors, including the investors in MET13, advising that MEP was "in negotiation with an expert E&P company over the past weeks while they conduct engineering diligence and develop an implementation plan." Lisiak forwarded a copy of this update to Mr. Field by email dated

May 20, 2011, characterizing it as "My update to my investors to keep them informed and interested. I think we have over $20M of interest."

168.    A true and correct copy of the May 20, 2011, Lisiak email to Mr. Field is annexed hereto as Exhibit 17.

169.    On May 31, 2011, Lisiak and Mr. Field and Regent (acting on behalf of SGM) exchanged a proposed term sheet for the Anderson transaction, which was marked "revised May 26, 2011." Throughout, the term sheet emphasizes that the definitive agreements are subject to completion of due diligence by Elgin Energy, LLC and its subsidiary MHA Petroleum Consultants LLC, and subject to completion of due diligence by Bayswater Exploration and Production, LLC ("Bayswater"). Nowhere is there any indication in this term sheet that any due diligence was to be performed by Mr. Field or Regent.

170.    A true and correct copy of the term sheet is annexed hereto as Exhibit 18.

171.    Thereafter, on June 3, 2011, Lisiak (without Regent or Mr. Field) met with Bayswater.

172.    Expressly based on what he learned in that June 3, 2011 meeting with Bayswater, Lisiak emailed another version of the term sheet to SGM, expressly revised based on what Bayswater had said to him concerning its initial diligence and analysis. Again, the revised term sheet with SGM was sent to SGM in care of Mr. Field and Regent.

173.    Subsequently, Lisiak personally travelled to Ohio with Bayswater and spent a day, together with Bayswater, inspecting the properties and conducting due diligence. Regent and Mr. Field did not go to Ohio with Bayswater and Lisiak on that trip.

174.    Shortly thereafter, Sanford B. Kaynor, Jr. (Sandy Kaynor), of the law firm of Jones Walker, on behalf of his client, MEP, drafted a "truncated diligence list" relating to due

diligence for the Deep Rights that MEP properly should have performed before closing on the Anderson Deal.

175.    On November 21, 2011, MEP sent an investor briefing to its investors, including the investors in MET13 (the "November 21, 2011 MEP Investor Briefing").

176.    A true and accurate copy of the November 21, 2011 MEP Investor Briefing is attached as <u>Exhibit 19</u> to this Complaint.

177.    The November 21, 2011 MEP Investor Briefing is misdated November 21, 2012; in fact, it was sent on November 21, 2011, not November 21, 2012.

178.    The "Logistics" and other sections of the November 21, 2011 MEP Investor Briefing describes much of the Regent Recommended Due Diligence that still needed to be completed prior to an acquisition, including (i) the Title Due Diligence, (ii) the Phase I Environmental Report, (iii) the Gas System Environmental Survey, (iv) the joint operating agreement with the Shallow Operator and (v) the Legal Due Diligence on NE Fuel.

179.    The November 21, 2011 MEP Investor Briefing provides that the Anderson Deal is "Subject to Diligence and Final Metropolitan Approval."

180.    The MET13 Loan Agreement incorporates the Regent Recommended Due Diligence for the Anderson Deal as release conditions for the MET13 Credit Line.

**The Lisiak Parties Were Responsible for, Conducted, Supervised, and Evaluated the Due Diligence Themselves.**

181.    MEP and Lisiak were responsible for conducting due diligence on the acquisition of the Anderson Deal, not Regent, Mr. Field, SGM, or any other SGM Released Party. All of the Regent Recommended Due Diligence and other due diligence for the Anderson

Deal was conducted by, supervised by and/or evaluated by one or more of the Lisiak Parties and their agents.

182.    The MEP November 21, 2011 Investor Briefing (subtitled "Findings from Paul Lisiak's Three Day Ohio Visit") provides that:

-- "We have discovered contiguous "tuck-in" acreage"

-- "We heard rumors from 3rd party sources (including a drilling contractor) of recently approved Washington County Utica wells."

-- "[W]e were able to personally confirm drilling preparation occurring at a specific site < 5 miles from our closest acreage."

-- "We visited record rooms in 2 county courthouses (Washington and Noble) where the title work abstraction occurs. There exists a large number of professional abstractors (who work for major energy companies) actively pursuing the manual process of records abstraction."

-- "We believe the market pricing for Company acreage is $3500 to $3750 today, before any additional catalysts."

-- "As a result, as we review title work, we will seek to release the acreage in larger block sizes."

-- "We have received well logs which are being reviewed by our experts."

183.    Neither Regent nor Mr. Field participated in Lisiak's three-day Ohio visit.

184.    Neither Regent nor Mr. Field is mentioned anywhere in the MEP November 21, 2011 Investor Briefing.

185.    The "we" and "our" in the MEP November 21, 2011, Investor Briefing is Lisiak and Mr. Miles Peet ("Peet") who is an employee of MEP, holding the title of senior associate, and is also an officer of Reed, holding the title Vice President of Operations. Mr. Peet is also the younger brother of one of Lisiak's long-time personal friends.

186.     Peet personally oversaw the Title Due Diligence on the Anderson Deal and was living in Ohio for much of November and December 2011 and January and February 2012 ("Peet's Title Work Supervision").

187.     Peet abruptly left Ohio in February 2012 after he found out that a criminal complaint was made, and a police report (the "Police Report") had been filed which accused him of accessing, without their permission, the iPhone of Sara Blankenship and the computer of Tim McCartney, two of the lead abstractors performing Title Due Diligence on the Anderson Deal.

188.     A true and accurate copy of the Police Report is attached as Exhibit 20 to this Complaint.

189.     On December 15, 2011, MET13 issued a confidential disclosure memorandum to its investors (the "December 15, 2011 MET13 CDM").

190.     A true and accurate copy of the December 15, 2011 MET13 CDM is attached as Exhibit 21 to this Complaint.

191.     The December 15, 2011 MET13 CDM was prepared by or on behalf of Lisiak, MEP, MET13 and/or METGP, reportedly by Sandy Kaynor of Jones Walker, MEP's law firm.

192.     Lisiak, MEP, MET13 and/or METGP delivered the December 15, 2011 MET13 CDM to each of the MET13 investors.

193.     Each of the MET13 investors acknowledged receipt of the December 15, 2011 MET13 CDM.

194.     The December 15, 2011, MET13 CDM is the legal and functional equivalent of a private placement memorandum, setting forth the nature of the proposed

investments, the material risks (and other points addressed and limited by appropriate due diligence), and who was responsible for selecting and managing the deal.

195. Nowhere in the December 15, 2011 MET13 CDM is there any claim that Regent or Mr. Field "fully vetted" the Anderson Deal.

196. To the contrary, the December 15, 2011, MET13 CDM references Regent as just one of several entities consulted by Lisiak, MEP, MET13 and/or METGP on the Anderson Deal.

197. Regent and Mr. Field were not paid by Lisiak Parties to evaluate the Anderson Deal. As noted, Regent and Mr. Field were then under contract with SGM.

198. Lisiak, MEP, MET13 and/or METGP were responsible for evaluating the Anderson Deal, not Regent and Mr. Field.

199. Lisiak, MEP, MET13 and/or METGP did retain at least two experts as their agents to evaluate the Anderson Deal, and conduct due diligence: John T. Boyd Mining and Geological Consultants ("JT Boyd") and Jason F. Henthorne ('Henthorne").

200. JT Boyd is one of the largest mining and consulting firms of independent mining consultants exclusively serving the domestic and international coal, mineral, and natural gas industries, and is an expert in mineral valuation including oil and gas.

201.    Lisiak, MEP, MET13 and/or METGP hired JT Boyd to evaluate the Anderson Deal. Further proof that Regent and Mr. Field and other SGM Released Parties were not reviewing or "vetting" the due diligence is set forth in Lisiak's January 3, 2012 email to Mr. Featherly (the "JT Boyd Email"), where Lisiak states that he was not going to provide due diligence to anyone other than the actual client of JT Boyd, at least not until after closing:

> I will be able to provide a copy of the JT Boyd Report once we close. These were the experts we hired who have a strict rule regarding disclosing their work outside of their clients. We will transfer the bill to Reed Energy and then the report will be the Company's.

202.    A true and accurate copy of the JT Boyd Email is attached as Exhibit 22 to this Complaint.

203.    A true and accurate copy of the version of the report prepared by JT Boyd, dated December 9, 2011, (the "JT Boyd Report") that Lisiak had furnished to Plaintiffs is attached as Exhibit 23 to this Complaint. (The redactions contained in this version of the JT Boyd Report remove, for example, the name of the client.)

204.    According to the JT Boyd Report, JT Boyd reviewed and evaluated the Anderson Deal and placed a value on the Anderson Deal at $50,000,000. See Exhibit 23.

205.    Nowhere in the JT Boyd Report does JT Boyd reference or name Regent, Mr. Field, SGM and/or the Anderson Marketing Materials as providing any factual or other basis for the JT Boyd Report.

206.    On April 21, 2011, and on multiple other occasions, Mr. Field had suggested to Lisiak that MEP should retain an expert to do an evaluation of the Anderson Deal, and any other similar oil and gas deal in which Lisiak or MEP might be interested. On April 21, 2011, Mr. Field suggested using Netherland and Sewell (an independent oil and gas engineering

and appraisal firm), a suggestion which he repeated over the following months. Lisiak and MEP did not retain Netherland and Sewell.

207.    Instead, Lisiak and MEP or other Lisiak-related Parties had retained JT Boyd. Separately, Lisiak Parties also hired Henthorne to evaluate the Anderson Deal (the "Henthorne Evaluation").

208.    Henthorne is a strategic advisor to MEP, founding Board Member of Reed, geologist for Reed, current Chief Executive Officer of Reed, and long-time personal friend of Lisiak.

209.    Henthorne holds himself out as an expert in the Ohio oil and gas industry, and in the evaluation of oil and gas properties. MEP also holds Henthorne as an expert in Ohio oil and gas, and in evaluating oil and gas properties.

210.    According to MEP's website ("Henthorne's MEP Profile"):

Jason F. Henthorne is the President, majority owner and a petroleum geologist at Petro Evaluation Services, Inc. in Wooster, Ohio, a second generation family owned business.

Jason has extensive deal experience throughout Ohio and Pennsylvania and has active business dealings with many of the major E&P producers in the Utica Shale. He created and managed the leasing and exploration of what became a 40,000+ acre block in Appalachia which was recently sold in a substantial transaction to a publicly traded E&P producer that is very active in the Utica Shale today.

Jason has extensive experience throughout Ohio and Pennsylvania in geological mapping using GIS, Seismic, Logs, and other Geophysical methods, exploring new and old areas, leasing, legal and title work, pipelines, EPA, DEP, and water related surface permitting issues. Prior to Petro, Jason worked in West Virginia, Louisiana, Colorado, Wyoming and Montana, consulting, computer modeling, mountain excavating and rock stabilizing, mud-logger consulting (for clients including Texaco & Columbia Natural Gas).

Jason was born and raised in Ohio before attending the University of Pennsylvania, earning a degree in Environmental Studies (BA, Concentration in Geology) in 1993. Mr. Henthorne is an AAPG Certified Petroleum Geologist (#6015), has been a member of the OOGA Ohio oil and gas association since 1997 and served as President of the Ohio Geological Society from 2003 to 2005.

211.    A true and accurate copy of Henthorne's MEP Profile is attached as Exhibit 24 to this Complaint.

212.    On or about April 26, 2011, Lisiak sent an email to Mr. Field with a map of oil, wet gas, and dry gas in various counties in Ohio, which Lisiak had obtained from his "expert friend," an apparent reference to Henthorne.

213.    A true and correct copy of the email and the map are annexed hereto as Exhibit 25.

214.    On information and belief, the Henthorne Evaluation was a continuous evaluation throughout 2011, starting in or before April 2011.

215.    The Henthorne Evaluation continued at least through the January 4, 2012 Reed Closing.

216.    On information and belief, Henthorne recommended to Lisiak, MEP, MET13, METGP and/or Reed that Lisiak, MEP, MET13, METGP and/or Reed should proceed with the January 4, 2012 Reed Closing.

217.    Contrary to their claims that they had relied on Mr. Field or Regent for their investment decisions and due diligence, Lisiak and the Lisiak Parties relied on Henthorne's recommendations and the JT Boyd Report in proceeding with the January 4, 2012 Reed Closing.

218.    As a Board Member of Reed, Henthorne voted in favor of Reed proceeding with the January 4, 2012 Reed Closing. Lisiak also voted in favor, as a Board Member of Reed.

219.    Henthorne and Lisiak voted in favor of Reed proceeding with the January 4, 2012, Reed Closing based on the Henthorne Evaluation and based on the JT Boyd Report, not based on Mr. Field or Regent

220.    The December 15, 2011 MET13 CDM provides that MEP, MET13, METGP and/or Reed were responsible for and conducted, supervised and/or evaluated all of the due diligence on the Anderson Deal.

221.    Page 2 of the December 15, 2011 MET13 CDM provides that:

It is the intention of the Company to secure a relationship with a new exploration and production operator for the shallow drilling rights who will develop an execution plan to revitalize the production. The Company has identified a lead candidate to be the operator and has begun negotiations, but will not enter into a binding joint operating agreement until its diligence of the shallow rights is complete.

222.    Page 3 of the December 15, 2011 MET13 CDM provides that:

During the Management Company's diligence on the current title abstraction process, the Company has determined that that it will not be able to consummate the acquisition of all Anderson Assets at once . . . .

223.    Page 2 of the December 15, 2011 MET13 CDM provides that:

Both Anderson Options contemplate the possibility of acquiring only that acreage for which an acceptable title opinion can be provided by counsel.

224.    Lisiak, MEP, MET13 and/or Reed know that their claim, that Regent or Mr. Field had represented to them that Regent or Mr. Field "fully vetted" the Anderson Deal, is false.

225.    Lisiak Parties know that their claim that Regent or Mr. Field had "fully vetted" the Anderson Field is false because the November 21, 2011 MEP Investor Briefing and the December 15, 2011 MET13 CDM, which were prepared by Lisiak, MEP, MET13 and/or METGP demonstrate (i) there was a significant amount of due diligence that still needed to be completed on the Anderson Deal, including the Regent Recommended Due Diligence, and (ii) it was Lisiak, MET13, MEP, METGP and/or Reed that were conducting, supervising and/or evaluating that due diligence, and which were responsible for conducting that due diligence, as they expressly proclaimed to their investors.

**Ready, Fire, then Aim: Lisiak Parties Chose to Close on Reed Despite Knowing that They Had Not Completed Due Diligence, Which Diligence Continued to Be Performed for Months After the January 4, 2012, Reed Closing.**

226.    Except for the Phase I Environmental Report, <u>none</u> of the Regent Recommended Due Diligence, all of which Regent and Mr. Field had suggested should be performed before the purchase, was completed prior to the January 4, 2012 Reed Closing.

227.    Both the November 21, 2011 MEP Investor Briefing and the December 15, 2011 MET13 CDM, provide that Anderson Deep Rights transaction only makes economic sense if there were at least 3,000 acres of Anderson Deep Rights with marketable or clean title.

228.    There were not 3,000 acres of Anderson Deep Rights with marketable or clean title as of the date of the January 4, 2012 Reed Closing.

229.    A true and accurate copy of the draft title report from S&J, which S&J only sent to Lisiak on January 19, 2012 (the "January 19, 2012 Title Report") is attached as Exhibit 26 to this Complaint.

230.    According to the January 19, 2012 Title Report, rendered sixteen (16) days after the January 4 2012, Reed Closing, as of January 19, 2012, S&J had reviewed over 3,600 acres of Anderson Deep Rights, of which only approximately 2,000 acres had clean or marketable title.

231.    S&J continued to review title. A true and accurate copy of the updated title report from S&J, which S&J sent to Lisiak on February 1, 2012, (the "February 1, 2012 Title Report") is attached as Exhibit 27 to this Complaint.

232.    According to the February 1, 2012 Title Report, as of February 1, 2012, a month after the January 4, 2012 Reed Closing, S&J had reviewed 4,011.586 acres of Anderson Deep Rights, of which only 2,769.61 acres had clean or marketable title.

233.    The first draft of the S&J title opinion for the Anderson Deep Rights was not provided by S&J until March 20, 2012 (the "First Draft of the Title Opinion").

234.    A true and accurate copy of the First Draft of the Title Opinion is attached as Exhibit 28 to this complaint.

235.    The First Draft of the Title Opinion was not provided until seventy-seven (77) days after the January 4, 2012 Reed Closing.

236.    The first draft of the complete title map for the Anderson Deep Rights was prepared by Complete Title Solutions ("CTS") and was sent to Peet and MEP on March 21, 2012, (the "First Deep Rights Title Map"), some two-and-a-half months after the January 4, 2012 Reed closing.

237.    A true and accurate copy of the First Deep Rights Title Map is attached as Exhibit 29 to this Complaint.

238.    In April 2012, MEP closed on the Anderson Shallow Operation, again doing so without having completed due diligence.

239.    On or about April 6, 2012, MEP closed on the Anderson Shallow Operation.

240.    As of April 6, 2012, only about half (50%) of the real property in the Anderson Shallow Operation had been abstracted and reviewed by S&J.

241.    As of the date of the Global Settlement Agreement, November 30, 2012, S&J still had not prepared a title opinion (draft or final) for the entirety of the Anderson Shallow Operation.

242.    As of May 2, 2013, when Mr. Featherly resigned from the Board of Reed, S&J still had not prepared a title opinion (draft or final) for the entirety of the Anderson Shallow Operation, more than a year after the April 6, 2012 closing on the Anderson Shallow Operation.

243.    On information and belief, the Gas System Environmental Survey was never completed. If the Gas System Environmental Study was completed, it was not completed before MEP closed on the Anderson Deal, or before MEP closed on the Anderson Shallow Operation.

244.    Lisiak, MEP, MET13 and/or METGP were responsible to conduct, supervise, and evaluate the due diligence on the Anderson Deal, including Regent Recommended Due Diligence, which responsibilities were non-delegable.

245.    Lisiak knew that the due diligence for the Anderson Deal, including the Regent Recommended Due Diligence (except for the Phase I Environmental Report) would not be completed until after the January 4, 2012, Reed Closing.

246.    Lisiak, MEP, and MET13 consciously decided to proceed with the January 4, 2012, Reed closing anyway, in the absence of due diligence. On information and belief, they did so because they feared losing investor interest from Lisiak's and MEP's investors and prospective investors, including investors in MET13

247.    A prudent fund manager would not close on substantial transactions without completing due diligence.

248.    Failure to complete due diligence before closing on substantial transactions is a material fact and a material risk factor.

249.    On information and belief, Lisiak Parties never informed their investors and prospective investors, including investors in MET13, that they had closed on the Anderson Deal or that they had closed on the Anderson Shallow Operation before they had completed due diligence.

**Marketing Materials Were Prepared at Lisiak's Request.**

250.    Lisiak in the Lisiak Letters alleges on behalf of the Lisiak Parties that (i) the Anderson Marketing Materials that Regent and/or Mr. Field assisted SGM in preparing were fraudulent and (ii) that the Lisiak Parties had relied on the Anderson Marketing Materials when they authorized and funded the January 4, 2012, Reed Closing, and the April 6, 2012, closing on the Anderson Shallow Operation (the "April 6, 2012 Shallow Closing").

251.    Regent and Mr. Field repeatedly maintained and told Lisiak that the development plan and financial projections contained in the Anderson Marketing Materials (the

"Original Development Plan & Financial Projections") needed to be revised and updated once the Regent Recommended Due Diligence was completed, including, but not limited to, completion of Title Due Diligence and the well-by-well inspection by the Shallow Operator.

252.   Henthorne, as part of the Henthorne Evaluation, expressly agreed with Regent and Mr. Field and SGM that the Original Development Plan & Financial Projections needed to be revised and updated.

253.   Henthorne also advised Lisiak Parties that the Original Development Plan & Financial Projections was not detailed enough.

254.   It was agreed by the Lisiak Parties, Henthorne, SGM, Mr. Featherly, Regent and Mr. Field, that the Original Development Plan & Financial Projections for the Anderson Deal needed to be updated and revised after there was a well-by-well inspection completed by the Shallow Operator and a new reserve engineering report was completed.

255.   Lisiak and the Lisiak Parties expressly chose to proceed with the January 4, 2012 Reed Closing before completing due diligence. The proceeds from the January 4, 2012, Reed Closing were used to fund third-party option payments on the Anderson Deep Rights and to pay for due diligence on the Anderson Deal after closing.

256.   None of the Lisiak Parties relied on the Anderson Marketing Materials or on any recommendations from SGM Released Parties (including Regent and Mr. Field) in going forward with the January 4, 2012 Reed Closing.

257.   Rather, the Lisiak Parties relied on the preliminary due diligence that Lisiak, MEP, MET13 and/or METGP had completed prior to the January 4, 2012, Reed Closing, including, but not limited, to the JT Boyd Report, the Henthorne Evaluation and Peet's Title Work Supervision to justify the January 4, 2012, Reed Closing.

258.    None of the Lisiak Parties relied on the Anderson Marketing Materials, which contains the original development plan and financial projections for the Anderson Shallow Operation, nor did the Lisiak Parties rely on any recommendations from SGM Released Parties (including Regent and Mr. Field) in going forward with the April 6, 2012, Shallow Closing.

259.    A true and accurate copy of the Revised and Updated Development Plan & Financial Projections for the Anderson Shallow Operation developed by the Shallow Operator, Larry Wise, and March 8, 2012, email from Mr. Field to Lisiak is attached as collective <u>Exhibit 30</u> to this Complaint.

260.    The Original Development Plant & Financial Projections for the Anderson Shallow Operation show $10,000,000 to $12,000,000 in EBITDA.

261.    The Revised and Updated Development Plan & Financial Projections for the Anderson Shallow Operation show approximately a 90% reduction in EBITDA. These numbers are even worse if they are normalized to take into account usual negative factors, such as the fact that oil production from a given well inevitably declines over time, absent introduction of new technology.

262.    Lisiak Parties logically could not have relied on the Original Development Plan & Financial Projections for the Anderson Shallow Operation contained in the Anderson Marketing Materials for the Anderson Shallow Closing, given that Lisiak was in possession of the Revised and Updated Development Plan & Financial Projections for the Anderson Shallow Operation that were submitted directly to Lisiak thirty (30) days prior to the Anderson Shallow Closing.

263. The Revised and Updated Development Plan & Financial Projections for the Anderson Shallow Operation do not support Lisiak Parties' decision to acquire the Anderson Shallow Operation.

**The Bayswater Preliminary Report Was Summarized at Lisiak's Express Request; Lisiak and MEP Possessed the Complete Bayswater Preliminary Report and Findings.**

264. Lisiak, in the Lisiak Letters, alleges that (i) Regent and/or Mr. Field fraudulently redacted information from a preliminary due diligence report prepared by Bayswater analyzing the Anderson Shallow Operation and (ii) the Lisiak Parties relied on the redacted report provided by Mr. Field in closing on the April 6, 2012, Anderson Shallow Closing.

265. The allegation is wholly and completely false. To the contrary. Lisiak and Lisiak Parties possessed the complete Bayswater preliminary report well before the closing; and the summary of the Bayswater preliminary report was only prepared by Mr. Field at the express request of Lisiak.

266. On June 3, 2011, Lisiak met with Steve M. Struna, the President of Bayswater ("Bayswater's President").

267. On June 7, 2011, Bayswater sent a team to meet with Lisiak and Mr. Featherly at the Anderson Shallow Operation and to perform an on-site preliminary inspection of the Anderson Shallow Operation (the "Preliminary Bayswater Inspection").

268. Neither Regent nor Mr. Field attended the Preliminary Bayswater Evaluation.

269.     On June 13, 2011, Mr. Field sent Mr. Featherly a copy of the complete preliminary report that Bayswater had prepared on the Anderson Shallow Operation based on the Preliminary Bayswater Inspection (the "Preliminary Bayswater Report").

270.     A true and accurate copy of the Preliminary Bayswater Report is attached as Exhibit 31 to this Complaint.

271.     On May 18, 2011, Lisiak sent Mr. Field an email specifically requesting that Mr. Field send Lisiak a "headline summary" of the Preliminary Bayswater Report.

272.     A true and accurate copy of the May 18, 2011, email from Lisiak to Mr. Field requesting a "headline summary" is attached as Exhibit 32 to this Complaint.

273.     Regent and/or Mr. Field were expressly following Lisiak's directions when they prepared a "headline summary" which, necessarily did not contain all of the Preliminary Bayswater Report.

274.     Lisiak had, however, received a complete copy of the Preliminary Bayswater Report, independently of Regent, Mr. Field, or SGM.

275.     Lisiak was in regular communication with Bayswater, even after Mr. Field sent Lisiak the "Bayswater Summary" that Lisiak had requested.

276.     A true and accurate copy of an email, dated June 22, 2011, from Lisiak to the Bayswater President is attached as Exhibit 33 to this Complaint, the "Bayswater Diligence E-Mail."

277.     As a prudent fund manager, Lisiak had a duty to ask Bayswater to provide him a full and complete copy of the Preliminary Bayswater Report.

278.     On information and belief, Lisiak requested Bayswater to forward a full and complete copy of the Preliminary Bayswater Report

279.     On information and belief, Bayswater did provide Lisiak or Lisiak Parties with a full and complete copy of the Preliminary Bayswater Report in or around June 2011.

280.     As a prudent fund manager, Lisiak had a duty to ask Bayswater about the negatives, downside and/or other risks in acquiring the Anderson Shallow Operation.

281.     On information and belief, Bayswater and/or the Bayswater President did inform Lisiak of Bayswater's preliminary conclusions as to the negatives, downsides and/or risks to the Anderson Shallow Operation.

282.     In late June of 2011, Bayswater declined to be the Shallow Operator for the Anderson Shallow Operation.

283.     Lisiak and Mr. Featherly met on March 16, 2012, at MEP's office in New York to discuss the proposed acquisition of the Anderson Shallow Operation (the "March 16, 2012, Shallow Discussion Meeting").

284.     Neither Mr. Field nor anyone else from Regent was present at or otherwise involved in that March 16, 2012 Shallow Discussion Meeting.

285.     A true and accurate copy of the agenda for the March 16, 2012, Shallow Discussion Meeting is attached as Exhibit 34 to this Complaint (the "March 16, 2012, Meeting Agenda").

286.     Mr. Featherly expressly advised Lisiak at the March 16, 2012 Shallow Discussion Meeting that it was his and SGM's strong view that Reed and/or NFI should not acquire the Anderson Shallow Operation.

287.     At the March 16, 2012, Shallow Discussion Meeting, Mr. Featherly handed Lisiak a package of documents supporting his position that Reed and/or NFI should not acquire the Anderson Shallow Operation (the "Anderson Shallow Package").

288.    The Anderson Shallow Package included the full and complete Preliminary Bayswater Report, which Mr. Featherly presumed Lisiak already had, and which Lisiak did not deny possessing.

289.    Lisiak was not at all surprised or upset when Mr. Featherly told Lisiak about the contents of the Preliminary Bayswater Report. Nor did he claim not to possess a copy of the Preliminary Report. Rather, Lisiak still insisted that Reed acquire the Anderson Shallow Operation and agreed with Mr. Featherly's suggestion that Reed and/or NFI should use the negative information contained in the Preliminary Bayswater Report as part of a strategy to negotiate a substantial reduction in the purchase price for the Anderson Shallow Operation.

290.    Thereafter, the Anderson Group agreed to a substantial purchase price reduction for the Anderson Shallow Operations, in part, on information and belief, because of the negative information contained in the complete copy of the Preliminary Bayswater Report.

291.    Lisiak claimed that if he had the complete Preliminary Bayswater Report, he never would have proceeded with the purchase of the Anderson Shallow Rights. In this regard, Lisiak claimed in the Lisiak Letters and in discussions with Mr. Field and Mr. Stephenson that Regent and/or Mr. Field somehow fraudulently deceived Lisiak or Lisiak Parties by providing Lisiak with the requested "headline summary" of the Preliminary Bayswater Report. Lisiak's claims in this regard are completely and entirely false, not least because he did have a complete copy of the Preliminary Bayswater Report.

**The Anderson Shallow Rights Acquisition**

292.    Lisiak, in the Lisiak Letters, alleges on behalf of the Lisiak Parties that the acquisition of the Anderson Shallow Operation by Reed and/or NFI is the fault of Regent and/or Mr. Field. Lisiak and Lisiak Parties know that this is simply not true.

**Original Rationale For Acquiring the Anderson Shallow Operation**

293.    As set forth in the November 21, 2011 MEP Investor Briefing and the December 15, 2011 MET13 CDM, Lisiak Parties' express rationale to its investors for acquiring the Anderson Shallow Operation was (i) the existence of 2,000 acres of deep drilling rights included as part of the assets of the Anderson Shallow Operation (the "Free Deep Rights") and (ii) the ability to significantly increase the production of the Anderson Shallow Operation with a capital expenditure budget not to exceed $2,000,000 (the proposed "CapEx Budget")

294.    In fact, Lisiak and the Lisiak Parties learned well before the January 4, 2012 Reed Closing that neither of these propositions was true, but Lisiak and the Lisiak Parties never informed MET13 investors and prospective investors that the original rationales for the January 4, 2012 Reed Closing were simply untrue.

**No Free Deep Rights**

295.    The original acquisition price of the Anderson Shallow Operation was $8,000,000.

296.    Lisiak and MEP and MET13 valued the Free Deep Rights included in the Anderson Shallow Operation at $7,500,000 to $9,000,000.

297.    Lisiak, MEP, and MET13 represented to MET13 investors and prospective investors that, when the Free Deep Rights were sold, the entire "shallow rights" acquired in acquiring the Anderson Shallow Operation would only have cost Reed and/or NFI $500,000 at most -- and Lisiak Parties could have generated an "arbitrage" profit of $1,000,000, plus acquired the shallow rights for free, depending on the sale price of the anticipated 2,000 acres of Free Deep Rights.

298.    However, the Anderson Shallow Operation did not have 2,000 acres of Free Deep Rights.

299.    Lisiak, MEP, and MET13 knew well prior to the January 4, 2012 Reed Closing that the Anderson Shallow Operation did not have 2,000 acres of Free Deep Rights.

300.    On December 20, 2011, a mere five (5) days after Lisiak, MEP and MET13 had sent out the December 15, 2011 MET13 CDM, Lisiak sent Mr. Featherly an email wherein Lisiak stated that there were at most only 500 acres of Free Deep Rights included in the Anderson Shallow Operation (the "No Free Deep Rights Email").

301.    A true and accurate copy of the No Free Deep Rights Email is attached as Exhibit 35 to this Complaint.

302.    Lisiak, MEP, and MET13 knew that the Anderson Shallow Operation did not have 2,000 acres of Free Deep Rights prior to the April 6, 2012, Anderson Shallow Closing.

303.    None of the title reports issued by S&J for the Anderson Shallow Operation show any Free Deep Rights at all included in the Anderson Shallow Operation

304.    Lisiak, MEP, and/or MET13 did not send out revised disclosures to MET13 investors and prospective investors, and did not advise that the December 15, 2011 MET13 CDM was inaccurate in these critical assumptions.

305.    The absence of Free Deep Rights was a materially adverse piece of information.

306.    Lisiak, MEP, and MET13 had an obligation to advise investors and prospective investors of this materially adverse information.

307.    Lisiak, MEP, and MET13 breached their obligations to disclosure material information, including materially adverse information, to their investors.

**No Significant Projected Increase In Production**

308.    The Original Development Plan & Financial Projections for the Anderson Shallow Operation, which was completed between February and May of 2011, presumed that the production on the Anderson Shallow Operation could be materially increased with a relatively small $2,000,000 capital expenditure budget, through the use of low-cost and low-risk recompletions and work-overs of existing wells

309.    The Revised Development Plan & Financial Projections for the Anderson Shallow Operation, which was completed in March 2012 (a year later), after a well-by-well inspection had been completed, concluded that (i) the production on the Anderson Shallow Operation could not be materially increased through low cost and low risk recompletions and work-overs of existing wells, and (ii) the only way to materially increase the production on the Shallow Operation would be through high-cost and high-risk drilling of new wells.

310.    On March 16, 2012, Mr. Featherly met with Lisiak and MEP to discuss whether Lisiak Parties should acquire the Anderson Shallow Operations (the "March 16, 2012 Shallow Discussion Meeting"), as more fully set forth below.

311.    Following up on those discussions, the next day, on March 17, 2012, Mr. Featherly sent MEP and Reed a new economic analysis of the Anderson Shallow Operation.

312.    Specifically, Mr. Featherly sent an email on March 17, 2012 to Peet, the MEP employee and Reed Vice President of Operations who had responsibilities for, among other things, overseeing Title Due Diligence on the Anderson Deal. Mr. Featherly's March 17, 2012 email annexed a new economic analysis of the Anderson Shallow Operation (the "March 17, 2012, Shallow Operation Economic Analysis").

313.    On information and belief, Peet promptly forwarded the March 17, 2012, Shallow Operation Economic Analysis to Lisiak.

314.    A true and accurate copy of the March 17, 2012 Shallow Operation Economic Analysis and the cover email is attached as Exhibit 36 to this Complaint.

315.    The March 17, 2012, Shallow Operation Economic Analysis was based on a purchase price for the Anderson Shallow Operation of $2,000,000 and a capital expenditure budget of $4,255,000.

316.    The March 17, 2012, Shallow Operation Economic Analysis shows a profit of only $495,422 after three years of operating the Anderson Shallow Operation, even presuming that all of the new wells were successful and no unsuccessful ("dry") wells were drilled.

317.    Lisiak and Lisiak Parties are well-aware that there is always a risk of dry wells in any drilling program, and that the March 17, 2012 Shallow Operation Economic Analysis contradicted Lisiak Parties' plan to expand the Anderson Shallow Operation.

318.    Mr. Featherly expressly advised Lisiak at the March 16, 2012 Shallow Discussion Meeting that the capital the Lisiak Parties had allocated for the Anderson Shallow Operation should be re-allocated to purchase more deep drilling rights as deep drilling rights would generate a higher and faster return for the Lisiak Parties.

**Lisiak's Improper Reasons for Acquiring the Anderson Shallow Operation**

319.    At the March 16, 2012 Shallow Discussion Meeting, Lisiak told Mr. Featherly that:

(i)  Reed and/or NFI must acquire the Anderson Shallow Operation.

(ii) If Reed and/or NFI do not acquire the Anderson Shallow Operation, the investors in MET13 will be livid, as they believed that the acquisition of the Anderson Shallow Operation was a "cornerstone" to the Anderson Deal.

(iii) If Reed and/or NFI do not acquire the Anderson Shallow Operation, then Lisiak will not be able to raise any additional capital from the investors in MET13;

(iv) If Lisiak does not raise any additional capital from the investors in MET13, then Reed will not have the capital required to acquire the additional deep rights that Reed has under contract and/or was in the process of negotiating.

320. The March 16, 2012 Meeting Agenda shows that Reed had obligations and/or projected obligations of $54,416,709 at the time.

321. In 2012, MET13 had agreed to provide up to a $27 million credit facility to Reed. Reed had no other sources of available capital.

322. Reed needed more than an additional $27 million to meet its obligations and projected obligations.

323. On information and belief, Lisiak, MEP, and/or MET13 caused Reed and/or NFI to acquire the Anderson Shallow Operation for the principal purpose of seeking to raise more capital from the investors in MET13.

324. Lisiak, MEP, and/or MET13 deliberately caused Reed and/or NFI to acquire the Anderson Shallow Operation without advising investors in MET13 of known material risks in acquiring the Anderson Shallow Operation.

325.    The May 22, 2012 CDM adds an additional risk factor: that "it is possible that the net proceeds of the offering will be insufficient in the aggregate for the Company to pursue the Additional Opportunities we would like to acquire."

326.    Lisiak, MEP, and MET13 knew that it was not only possible, it was a certainty that the additional up to $4,121,000 in newly issued Class B limited partnership interests (increasing the total offering to $27,551,020) was wholly insufficient in the aggregate for the Company to pursue the Additional Opportunities that had already been budgeted to be acquired. Of the $27,551,020, $27 million was used to provide a credit facility to Reed; Lisiak has never explained what he did with the other $551,020.

**Lisiak's Unilateral Assumption of Environmental & Title Liabilities**

327.    Lisiak, MEP and MET13 were so determined for Reed and/or NFI to acquire the Anderson Shallow Operation that Lisiak agreed that Reed and NFI would assume environmental liability and title liability related to not only the Anderson Shallow Operation, but to the Anderson Deep Rights that Reed had already acquired, in order to obtain a purchase price reduction on the Anderson Shallow Operation to $3,000,000.

328.    Lisiak and MEP agreed on behalf of Reed and NFI for them to assume these environmental liabilities without undertaking proper due diligence and without analysis or knowledge of the extent of the environmental liabilities and risks being assumed.

329.    Lisiak and MEP agreed on behalf of Reed and NFI for them to assume title liabilities without undertaking proper due diligence and without analysis or knowledge of the extent of title liabilities and risks being assumed.

330.    SGM, and SGM Released Parties, including Regent and Mr. Field, neither approved nor provided any advice to Lisiak, MEP, Reed, or NFI suggesting that unknown and

unquantified environmental liabilities and risks, and unknown and unquantified title liabilities and risks should be assumed

331.    On information and belief, Lisiak and MEP and Lisiak Parties never informed Lisiak's and MEP's investors, including the investors in MET13, of the additional substantial risks that Lisiak and MEP were causing Reed and NFI to incur by assuming unquantified and unknown environmental liabilities, and by assuming unquantified and unknown title liabilities.

332.    A reasonable fund manager would not assume unquantified and unknown environmental liabilities when purchasing oil and gas assets, especially with regard to long-established and operating oil and gas field.

333.    A reasonable fund manager would not assume unquantified title liabilities when purchasing real estate assets.

334.    A true and accurate copy of the Wrap Around Agreement among Reed, NFI and the Anderson Group, dated February 1, 2012, and executed on April 6, 2012, (the "Wrap Around Agreement") is attached as Exhibit 37 to this Complaint.

335.    Section 3 of the Wrap Around Agreement provides that

Reed agrees to hold harmless and forever release, discharge, cancel, waive and acquit each member of the Anderson Group, including, but not limited to, Mr. Anderson and Mrs. Anderson:

a) For any and all retained liabilities and/or obligations of the Anderson Group as set forth in Section 2.06(a) of the Option Agreement with respect to an Adverse Environmental Condition (as defined in the Option Agreement), solely as such retained liabilities and/or obligations relate to the Shallow Rights owned by North East Fuel Inc. (collectively, the "NE Fuel Environmental Liabilities").

b) For any and all breaches of Section 2.07(f) of the Option Agreement (representation and warranty for no adverse environmental

condition) and/or Section 2.07(h) of the Option Agreement (representation and warranty for title) (collectively, the "Environmental & Title Representations and Warranties").

c) For any and all rights, claims, demands, and/or causes of action that Reed may allegedly and/or actually have against the Anderson Group and/or any and all actions that Reed may take against the Anderson Group with respect to the NE Fuel Environmental Liabilities and/or the Environmental & Title Representations and Warranties.

d) From the Anderson Group's indemnification of Reed, as set forth in Section 2.11 of the Option Agreement, solely as such indemnification relates to the NE Fuel Environmental Liabilities and/or the Environmental & Title Representations and Warranties.

336.    When Lisiak authorized the execution of the Wrap Around Agreement, Lisiak, MEP and MET13 were in possession of:

(i)     The Phase I Environmental Report, which described some of the then-known environmental liabilities of the Anderson Shallow Operation.

(ii)    The March 17, 2012, Shallow Operation Economic Analysis, which included budget items then-anticipated for certain environmental liabilities, including a $700,000 budget for plug and abandonment liability, and $150,000 budget for regulatory compliance, but without any quantification of the total potential environmental liabilities.

337.    Lisiak and the Lisiak Parties' attorneys, Jones Walker, approved the Wrap Around Agreement on April 2, 2012, ("April 2, 2012, Jones Walker Email").

338.    Attached as Exhibit 38 to this Complaint is a true and accurate copy of April 2, 2012, Jones Walker Email.

**Lisiak's Waiver Of Certified Financial Statements as a Closing Condition to The Purchase Of The Anderson Shallow Operation By Reed and/or NFI**

339.     Section 14(e)(ii)(1) of the Stock Purchase Agreement, dated October 20, 2011, for the Anderson Shallow Operation (the "Anderson Stock Purchase Agreement") required the Anderson Group to provide certified financial statements for the Anderson Shallow Operation.

340.     A true and accurate copy of the Anderson Stock Purchase Agreement is attached as Exhibit 39 to this Complaint.

341.     The accountant for the Anderson Group refused to certify the financial statements for the Anderson Shallow Operation.

342.     Lisiak, acting for MEP and on behalf of Reed and/or NFI, waived the requirement for certified financial statements as a condition to the purchase of the Anderson Shallow Operation.

343.     No consent was requested of or provided by Regent or Mr. Field to waive the contractual requirement for certified financial statements from the Anderson Group.

344.     No reasonable fund manager would waive the requirement for certified financial statements in a stock purchase agreement, especially after the accountant for the acquired party expressly had refused to certify the financial statements

345.     On information and belief, Lisiak and Lisiak Parties never informed investors in MET13 that Reed and/or NFI were waiving the requirement for certified financial statements for the Anderson Shallow Operation.

346.     On information and belief, Lisiak and Lisiak Parties never informed investors in MET13 that Reed and/or NFI waived the requirement for certified financial statements after the accountant for the Andersons had refused to certify the financial statements for the Anderson Shallow Operation.

**Lisiak's Waiver Of No Material Adverse Changes to Production
Volume and Financial Condition of Anderson Shallow Operation
as a Closing Condition to the Purchase of the Anderson Shallow
Operation By Reed and/or NFI**

347.    Section 14(e)(v) of the Anderson Stock Purchase Agreement provides that:

> Since one (1) week prior to the Closing Date there has not been,
> and there will not be as of the Closing Date, any material, adverse
> change in the financial condition of the Corporation.

348.    Section 17(d) of the SPA provides that the obligation of the purchaser to close is subject to "no material change in the volume of business, or financial condition of the Corporation."

349.    A true and accurate copy of the 2010 and 2011 financial statements (through September 2011) for the Anderson Shallow Operation, as provided by the Anderson Group, is attached as Exhibit 40 to this Complaint.

350.    The 2010 financial statement for NE Fuel shows net revenue of $239,677 and a relatively significant profit.

351.    The 2011 financial statement for NE Fuel shows net revenue of $142,622.00 and a relatively significant loss.

**Lisiak's Waiver of Material Adverse Changes as a Loan Advance
Release Condition by MET13**

352.    The MET13 Loan Agreement contained a standard "no material adverse change" clause (a "MAC clause"), which provided that MET13 had no obligation to release funds for the purchase of the Anderson Shallow Operation in the event of a material adverse change.

353.    Lisiak and/or MEP caused MET13 to release those funds notwithstanding the existence of multiple material adverse changes.

354.    Section 5.2(r) of the MET13 Loan Agreement provides that:

There shall have occurred no material adverse changes, determined in Lender's sole discretion, either individually or in the aggregate, in the assets, liabilities, financial conditions, business operations, affairs or circumstances of Debtor, SGM, North East Fuel, Inc. or any Subsidiaries from those reflected in the most    recent financial statements furnished to Lender prior to the date that the Shallow Rights Advance is requested.

355.    Numerous material adverse changes occurred to the "assets, liabilities, financial conditions, business conditions, business operations, affairs or circumstances" of the Anderson Shallow Operation between the December 15, 2011 MET13 CDM and the April 6, 2012 Shallow Closing.

356.    Lisiak, MEP, and MET13 knew on or before December 20, 2011 that the Anderson Shallow Operation did not possess 2,000 acres of Free Deep Rights, as expressly admitted in the No Free Deep Rights Email that Lisiak sent to Mr. Featherly.

357.    Lisiak, MEP, and MET13 knew on or before March 8, 2012 that no material increase in the production of the existing wells included in the Anderson Shallow Operation could be achieved with limited capital expenditures, consistent with the Revised & Updated Development Plan that Mr. Field had sent to Lisiak.

358.    Lisiak, MEP and MET13 knew on or before March 17, 2012, that Reed, NFI and/or NE Fuel would have to spend at least $700,000 plugging and abandoning the existing wells on the Anderson Shallow Operation and $150,000 on regulatory compliance on the existing wells on the Anderson Shallow Operation, consistent with the March 17, 2012 Shallow Operation Economic Analysis Mr. Featherly sent to Peet.

359.    Lisiak, MEP and MET13 knew on or before April 2, 2012 that Reed, NFI and/or NE Fuel were assuming all of the environmental liabilities associated with the Anderson Shallow Operation, consistent with the April 2, 2012, Jones Walker Email to Lisiak.

360.    Lisiak, MEP and MET13 knew prior to the April 6, 2012, Anderson Shallow Closing that the financial condition of the Anderson Shallow Operation had deteriorated significantly in 2011 as compared to 2010.

361.    Any one of the above material adverse changes to the Anderson Shallow Operation by itself would have allowed and justified MET13 to withhold funding to Reed and/or NFI for the purchase of the Anderson Shallow Operation.

362.    Instead of withholding funding, Lisiak and MEP authorized MET13 to release funding to Reed and/or NFI to purchase the Anderson Shallow Operation.

363.    A reasonable fund manager would have exercised the material adverse change clause, and would not have permitted MET13 to release funds to Reed and/or NFI to purchase the Anderson Shallow Operation.

364.    On information and belief, Lisiak, MEP, and MET13 did not inform the investors in MET13 of the material adverse changes that had occurred prior to the purchase of the Anderson Shallow Operation.

365.    On information and belief, Lisiak, MEP, and MET13 did not inform the investors in MET13 that Lisiak, MEP and/or MET13 were waiving rights under the MAC clause, despite the existence of multiple material adverse changes.

**Lisiak' Waiver of Title to Anderson Shallow Rights as a MET13**
**Loan Advance Release Condition by MET13**

366.    The MET13 Loan Agreement contains a standard requirement that MET13 have proof that NE Fuel own 100% of the Shallow Rights, free and clear of all liens, by means of a title opinion or title report, before releasing funds to allow the purchase of NE Fuel.

367.    Lisiak, MEP, and MET13 knew that they did not have a title opinion or title report that proved NE Fuel owns 100% of the Shallow Rights, but they nonetheless caused MET13 to release funds for the purchase of NE Fuel.

368.    Section 5.2(h) of the MET13 Loan Agreement requires

> Evidence satisfactory to the Lender that upon consummation of the Shallow Rights Transactions…North East Fuel owns one hundred percent (100%) of the Shallow Rights free and clear of any Lien, including, without limitation, a title opinion and/or title report in form and substance satisfactory to Lender in Lender's sole discretion from Steptoe & Johnson, LLP with respect to the Shallow Rights.

369.    As of the April 6, 2012, Anderson Shallow Closing, no title report or title opinion had been issued demonstrating that NE Fuel owned 100% of the Shallow Rights free and clear of liens.

370.    As of April 6, 2012, no title report or title opinion could have been issued relating to 100% of the Shallow Rights, because as of that date, S&J had not even completed a full abstract and review of 100% of the Anderson Shallow Operation acreage.

371.    As of April 6, 2012, S&J had only abstracted and reviewed approximately half (50%) of the Anderson Shallow Operation.

372.    As of April 6, 2012, no title opinion or title report relating to the Anderson Shallow Operation had been provided by S&J (or any other lawyers or any title company) to Reed, NFI, NE Fuel and/or MET13.

373.   Lisiak, MEP, and MET13 waived the title verification requirement for the Anderson Shallow Operation.

374.   A reasonable fund manager would not have waived the requirements for title verification for the Anderson Shallow Operation.

375.   Waiver of the title verification requirements is material.

376.   On information and belief, Lisiak, MEP, and MET13 never told investors in MET13 that MET13 had waived the title verification requirements before closing on the Anderson Shallow Operations.

**Lisiak's Waiver of Proper Documentation as a Release Condition
to a Loan Advance by MET13**

377.   Multiple documents needed to be completed and executed prior to MET13 advancing Reed and/or NFI funds to purchase the Anderson Shallow Operation.

378.   In particular, numerous documents are specified in Sections 5.2(a), (b), (c), (d), (e), (g), (m) and (p) of the MET13 Loan Agreement, all of which were required to have been completed prior to MET13 advancing Reed and/or NFI funds to purchase the Anderson Shallow Operation (the "MET13 Document Requirements").

379.   The overwhelming majority, and perhaps all, of the MET13 Document Requirements had not been completed as of the date of the April 6, 2012, Anderson Shallow Closing.

380.   Mr. Featherly, who had already advised Lisiak not to proceed with the April 6, 2012, Anderson Shallow Closing, sent Lisiak numerous emails identifying numerous problems and defects adverse to MET13, Reed and/or NFI in the execution copies of documents

that had been prepared by MET13's own attorneys (the "Shallow Closing Document Defect Emails").

381.    A true and accurate copy of the Shallow Closing Document Defect Emails is attached as <u>Exhibit 41</u> to this Complaint.

382.    When Mr. Featherly discussed the Shallow Closing Document Defect Emails with Lisiak, Lisiak informed Mr. Featherly that the MET13 Document Requirements were "internal documents" that could be resolved after the April 6, 2012, Anderson Shallow Closing.

383.    The MET13 Document Requirements were still not satisfied as of November 30, 2012, the date of the Global Settlement Agreement, as there was no complete, fixed, and appropriate set of Shallow Closing documents.

384.    The MET13 Document Requirements were not satisfied as of May 2, 2013, when Mr. Featherly resigned from the Board of Managers of Reed.

385.    MEP's lawyers, had not even completed or provided the parties with a closing binder for the April 6, 2012, Anderson Shallow Closing as of the date of the November 30, 2012, Global Settlement Agreement, despite SGM's repeated requests to Lisiak and MEP from April through November 2012 for a complete and final set of documents relating to the April 6, 2012, Anderson Shallow Closing.

386.    There still was no closing binder for the April 6, 2012, Anderson Shallow Closing more than a year after the closing, on May 2, 2013, when Mr. Featherly resigned from the Board of Managers of Reed.

387.     On information and belief, Lisiak, MEP, MET13, and other Lisiak Parties never informed the investors in MET13 of the lack of proper documentation for the April 6, 2012, Anderson Shallow Closing.

388.     On information and belief, Lisiak, MEP, MET13, and other Lisiak Parties never informed the investors in MET13 that a closing binder had not been prepared for the April 6, 2012, Anderson Shallow Closing.

389.     A reasonable fund manager would have required proper documents before closing.

390.     A reasonable fund manager would not have closed without proper documentation

391.     A reasonable fund manager would have insisted on preparation of a closing binder, so that there would not be any issues as to the terms of the Anderson Shallow Closing

392.     The absence of proper documentation is material.

**Lisiak and MEP Were Responsible for Acquisition of the
Anderson Shallow Operation.**

393.     Regent and Mr. Field lacked control over any of the Lisiak Parties.

394.     SGM, Regent, Mr. Field, and the other SGM Released Parties lacked controlling voting authority or power at any of the Lisiak Parties.

395.     Neither Regent nor Mr. Field had any right or ability to vote at any of the Lisiak Parties.

396.     MET13 appointed Lisiak and Henthorne to the Board of Managers of Reed.

397.    Lisiak and Henthorne both voted in favor of Reed acquiring the Anderson Shallow Operation.

398.    Lisiak and Henthorne both voted in favor of Reed borrowing funds from MET13 to acquire the Anderson Shallow Operation.

399.    Lisiak or Henthorne could have stopped Reed from acquiring the Anderson Shallow Operation by voting against the acquisition.

400.    Lisiak or Henthorne could have stopped Reed from borrowing funds from MET13 to acquire the Anderson Shallow Operating by voting against it.

401.    Lisiak as Manager of METGP (which is the general partner of MET13) could have stopped MET13 from lending Reed and/or NFI the capital used to acquire the Anderson Shallow Operation.

402.    Lisiak as Managing Partner of MEP (which is the Management Company of MET13) could have stopped MET13 from lending Reed and/or NFI the capital used to acquire the Anderson Shallow Operation.

403.    MEP was also the CFO of Reed.

404.    Lisiak as the Managing Partner of MEP could have stopped MEP and/or Reed from wiring the purchase price of the Anderson Shallow Operation to the Anderson Group.

**Lisiak, and Lisiak Parties Had Ample Reasons**
**Not to Close on April 6, 2012, but Chose to Ignore that Information.**

405.    Prior to the April 6, 2012, Anderson Shallow Closing, Lisiak, MEP and the Lisiak Parties were in possession of material adverse information concerning the Anderson Shallow Operation.

406.    Based on the negative information in Lisiak's and Lisiak Parties' possession at the time of the April 6, 2012, Anderson Shallow Closing, and given the absence of proper due diligence, it was a violation of the business judgment rule for Reed and/or NFI to have acquired the Anderson Shallow Operation.

407.    Lisiak and MEP claim to be prudent fund managers.

408.    A prudent fund manager would not have acquired and/or invested in the Anderson Shallow Operation based on the information that Lisiak and MEP had in their possession at the time of the April 6, 2012, Anderson Shallow Closing.

409.    On information and belief, Lisiak and MEP and MET13 chose to close on the Anderson Shallow Operation for the improper purpose of inducing the investors in MET13 to invest more capital, or not to seek to withdraw capital that they had already invested.

410.    On information and belief, Lisiak and MEP deliberately withheld from the investors in MET13 most if not all of the material adverse information in their possession concerning the Anderson Shallow Operation.

411.    Lisiak, MEP and MET13 did not update the December 15, 2011 MET13 CDM or inform investors of the material adverse information that Lisiak had received, on or before December 2011, concerning the Anderson Shallow Operation.

412.    On May 22, 2012, Lisiak, MET13, MEP and/or METGP issued the first supplement to the confidential disclosure memorandum of MET13 (the "May 22, 2012, MET13 CDM").

413.    A true and accurate copy of the May 22, 2012 MET13 CDM (excluding exhibits) is attached as Exhibit 42 to this Complaint.

414.    On December 13, 2012, Lisiak, MET13, MEP and/or METGP issued the second supplement to the confidential disclosure memorandum of MET3 (the "December 13, 2012, MET13 CDM").

415.    A true and accurate copy of the December 13, 2012 MET13 CDM (excluding exhibits) is attached as Exhibit 43 to this Complaint.

416.    Both the May 22, 2012 MET13 CDM and the December 13, 2012 CDM were delivered by Lisiak, MET13, MEP and/or METGP to the existing and to potential investors in MET13.

417.    Neither the May 22, 2012 MET13 CDM nor the December 13, 2012 CDM contains the material adverse information concerning the Anderson Shallow Operation that was in Lisiak's and MEP's and Lisiak Parties' possession on and prior to the date of the April 6, 2012, Anderson Shallow Closing.

418.    The May 22, 2012 MET13 CDM and the December 13, 2012 CDM both fail to disclose that there were material adverse changes to the Anderson Shallow Operation.

419.    The May 22, 2012 MET13 CDM and the December 13, 2012 CDM both fail to disclose that the Anderson Shallow Operation did not include 2,000 acres of Free Deep Rights.

420.    The May 22, 2012 MET13 CDM and the December 13, 2012 CDM both fail to disclose that the Revised and Updated Development Plan & Financial Projections for the Anderson Shallow Operation provided that it was unlikely that there would be a material increase in the production of the existing Anderson Shallow Operation's wells.

421.    The May 22, 2012 MET13 CDM and the December 13, 2012 CDM both fail to disclose that MET13 had waived most of the release conditions for the loan advance for the Anderson Shallow Operation acquisition.

422.    The May 22, 2012 MET13 CDM and the December 13, 2012 CDM both fail to disclose that Reed and/or NFI had assumed the existing environmental liability on the Anderson Shallow Operation.

423.    The December 13, 2012 CDM fails to disclose the negative information concerning the Anderson Shallow Operation that Lisiak knew as of December 13, 2012.

424.    Around mid-October 2012 the Shallow Operator drilled a shallow well at a cost of approximately $150,000 (the "New Shallow Well").

425.    The New Shallow Well produced only 6-7 barrels of oil per day with a compressor and 2 barrels of oil per day without a compressor, as set forth in the report on the New Shallow Well that the Shallow Operator sent to Mr. Featherly on November 26, 2012.

426.    Mr. Featherly promptly forwarded the report to Lisiak on November 27, 2012 (the "New Shallow Well Report").

427.    A true and accurate copy of the New Shallow Well Report and email trail is attached as collective Exhibit 44 to this Complaint.

428.    The New Shallow Well Report, and the results of the New Shallow Well, represented a significant setback and disappointment.

429.    Two days after receiving the New Shallow Well Report, on November 29, 2012, Lisiak, MET13, MEP and/or METGP sent existing and/or potential investors in MET13 a Recommendation for Additional Senior Debt dated November 29, 2012, (the "Lisiak Investment Recommendation").

430.    A true and accurate copy of the Lisiak Investment Recommendation is attached as Exhibit 45 to this Complaint.

431.    The Lisiak Investment Recommendation provides that the Anderson Shallow Operation "is beginning to perform regarding new infield drilling which will be the driver for future value creation."

432.    The Lisiak Investment Recommendation bases an entire infield drilling program for the Anderson Shallow Operation on the New Well, which the Lisiak Investment Recommendation falsely calls a "success."

433.    The New Shallow Well was a failure, not a success, and a material adverse development.

434.    Lisiak had numerous discussions with Mr. Featherly prior to December 13, 2012, in which Lisiak expressly and repeatedly used the term "disaster" to describe the New Shallow Well.

435.    As of December 13, 2012, Lisiak had repeatedly asserted to Mr. Featherly that there were few if any opportunities to drill new wells on the Anderson Shallow Operation, and that the natural gas in the Anderson Shallow Operation's oil and gas fields had been depleted.

436.    Lisiak, MET13, MEP and/or METGP used the May 22, 2012, MET13 CDM to raise an additional $4,121,020 for MET13 from investors.

437.    Lisiak, MET13, MEP and/or METGP used the December 13, 2012, MET13 CDM and the November 29, 2012 Lisiak Investment Recommendation to raise an additional $11,000,000 for MET13

438.   A prudent fund manager would not have called the New Shallow Well a "success" in communicating to investors.

439.   Calling the New Shallow Well a "success" was a material misrepresentation.

440.   Telling or implying to investors that the drilling program for the Anderson Shallow Operation was justified based on the New Shallow Well was a material misrepresentation.

**Sale of Anderson Deep Rights**

441.   Lisiak in the Lisiak Letters alleges on behalf of the Lisiak Parties that the failure of Reed to sell the Anderson Deep Rights is the fault of Regent and/or Mr. Field.

442.   Regent and/or Mr. Field were not required to sell the Anderson Deep Rights for Reed.

443.   In the December 15, 2011, MET13 CDM, Lisiak Parties alleged that SGM (not Regent) was handling the sale of the Deep Rights:

> With the guidance and leadership of Regent, **SGM** will be responsible for conducting any process with respect to the sale of the Andersons' deep drilling rights.

(Emphasis supplied.)

444.   On information and belief, in early 2012 Regent had assigned its rights to AMF.

445.   SGM negotiated a fee agreement for Regent with Reed, to compensate Regent for assisting SGM with the Anderson Deal (the "Regent Fee Agreement").

446.   Attached as Exhibit 46 is a true and accurate copy of the January 4, 2012, Regent Fee Agreement.

447.    SGM was required to compensate Regent as per the Regent-SGM Consulting Agreement.

448.    Section 1 of the Regent Fee Agreement provides that Regent's consulting fee was already earned "in connection with services rendered by Regent related to the transactions contemplated by the Mineral Rights Option Agreements" associated with the Anderson Deal.

449.    Regent's consulting fee is a success fee, payable in two tranches:

450.    First, Regent was to have been paid $500,000 on a pro rata basis as Reed acquired 3,500 to 7,000 acres of Anderson Deep Rights.

451.    Second, Regent was to receive an additional $500,000 if (i) Regent is "the procuring cause" for the sale of the Anderson Deep Rights and (ii) the sale price is "equal to or greater than $4,000/acre."

452.    The second major closing for the Anderson Deep Rights was on March 28, 2012, (the "Anderson Deep Rights Closing").

453.    On July 26, 2012, Reed hired Evercore Partners, a leading independent investment banking and advisory firm, to sell the Anderson Deep Rights.

454.    A true and accurate copy of the agreement between Reed and Evercore Partners LLC, dated July 26, 2012, is attached as Exhibit 47 to this Complaint.

455.    Evercore, not Regent, is responsible for selling the Anderson Deep Rights

456.    Evercore has not sold the Anderson Deep Rights, despite having had twelve (12) months to do so.

457.    Lisiak also claims in the Lisiak Letters that Reed did not receive any bona fide offers for the Anderson Deep Rights.

458.    This is untrue. Reed executed a purchase agreement with Flat Rock Partners in early February 2012 (the "Flat Rock PSA").

459.    Reed then removed the Anderson Deep Rights from the auction process being managed by Evercore, as per Evercore's email in February 2012 to potential buyers of the Anderson Deep Rights (the "Anderson Deep Rights Withdrawal Email").

460.    Attached as Exhibit 48 to this Complaint is a true and accurate copy of the relevant portions of the Anderson Deep Rights Withdrawal Email that was sent to Mr. Featherly.

461.    The purchase price for the Anderson Deep Rights set forth in the Flat Rock SPA is $2,850 per acre.

462.    Reed paid less than $1,850 per acre for the Anderson Deep Rights.

463.    Flat Rock subsequently elected not to close on the Anderson Deep Rights because of the accelerated closing time line unilaterally imposed by Lisiak, as per Lisiak's email to Mr. Featherly on March 1, 2012, (the "Flat Rock Email").

464.    A true and accurate copy of the Flat Rock Email is attached as Exhibit 49 to this Complaint.

465.    A true and accurate copy of the acquisition budget of Reed from April 20, 2012, that Miles Peet emailed to Mr. Featherly (the "April 20, 2012, Reed Acquisition Budget") is attached as Exhibit 50 to this Complaint.

466.    The April 20, 2012, Reed Acquisition Budget totals 39,415 acres of deep drilling rights at a cost of over $64,600,000.

467.    The Reed Acquisition Budget does not include the (i) acreage positions known as (a) the MNW Group, which includes approximately 8,000 acres of deep drilling rights costing approximately $20,800,000 or (b) the Caywood Group, which includes approximately

6,000 acres of deep drilling rights costing approximately $15,600,000 or (ii) the title work for the MNW Group or the Caywood Group, which would involve additional substantial costs.

468.    Reed lost most of the Additional Deep Rights, because Reed did not have the capital to close on the Additional Deep Rights.

469.    Reed invested and simply lost at least $3,654,000 in down payments, extension fees, broker fees, and title work in the Additional Deep Rights that Reed lost.

470.    Neither Regent nor Mr. Field caused Reed to invest in Additional Deep Rights that Reed did not or would not have the capital to acquire.

471.    Regent, Mr. Field, SGM, and other SGM Released Parties simply did not have control over Reed, the Anderson Deal or the Additional Deep Rights.

472.    Lisiak and MEP and Lisiak Parties had control over Reed, the Anderson Deal and the Additional Deep Rights.

473.    There is no one to blame for the failure of Reed, the failure of the Anderson Deal, the loss of capital spent on the Additional Deep Rights, and the loss of capital to the investors in MET13 other than Lisiak and the Lisiak Parties.

474.    A reasonable fund manager would not have invested over $3,654,000 in Additional Deep Rights without having the capital to purchase those rights.

475.    On information and belief, Lisiak and the Lisiak Parties have never told investors in MET13 that they wasted in excess of $3,654,000 in Additional Deep Rights that they later surrendered, without recovering a penny.

476.    Plaintiffs seek a declaration that Mr. Field and Regent are SGM Released Parties under the Global Settlement Agreement, and that Lisiak Parties breached the Global Settlement Agreement by asserting claims and threatening litigation as against Mr. Field and

Regent, and by encouraging third parties to assert claims and threaten litigation against Mr. Field and Regent

477.    SGM also has suffered damages, in an amount to be determined at trial, and is entitled to indemnification and payment and reimbursement of costs and attorneys' fees, on account these contractual breaches by Lisiak and Lisiak Parties.

## COUNT FIVE
### (Breach of Contract -- Violation of Non-Disparagement Clause and Other Contractual Violations)

478.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-477 of this Complaint with the same force and effect as if fully set forth herein.

479.    Section 13 of the Global Settlement Agreement provides that:

> Each of the Parties hereto agrees that he shall not (and shall use reasonable best efforts to cause all persons associated with him to refraining to) use disparaging or disrespectful words to or in the presence of any third party intended or reasonably expected to injure or otherwise compromise any other Party's reputation or business or professional or personal status.

480.    On June 13, 2012, Lisiak on behalf of each of the Lisiak Parties met with Mr. Field and Charles Stephenson in Tulsa, Oklahoma (the "June 13, 2012, Lisiak-Field Meeting").

481.    At the June 13, 2012, Lisiak-Field Meeting, Lisiak repeatedly claimed and advised Messrs. Field and Stephenson that Mr. Featherly was a habitual "liar."

482.    On information and belief, Lisiak routinely has made similar disparaging remarks about Mr. Featherly and SGM in violation of Section 13 of the Global Settlement Agreement ("Lisiak Disparaging Statements").

483.    Lisiak's Disparaging Statements, including calling Mr. Featherly a "liar" and otherwise disparaging him, were intended to injure and compromise Mr. Featherly's reputation and professional and personal status.

484.    Lisiak's Disparaging Statements breach Section 13 of the Global Settlement Agreement

485.    Lisiak and Lisiak Parties also have violated numerous other provisions of the Global Settlement Agreement. For example, Lisiak and Lisiak Parties have failed to inform SGM of various written and oral offers and expressions of interest as to particular properties, and Lisiak and Lisiak Parties have failed to consult with SGM in responding to such offers and expressions of interest.

486.    Lisiak's Disparaging Statements are also consistent with a pattern and practice of the Lisiak Parties ignoring and deliberately breaching and repudiating or seeking to repudiate the Global Settlement Agreement, as further set forth in the other Counts of this Complaint.

487.    Mr. Featherly seeks , an order declaring that Lisiak and Lisiak Parties breached the Global Settlement Agreement and enjoining and barring Lisiak and Lisiak Parties from making any further disparaging statements about Mr. Featherly or SGM.

488.    Mr. Featherly also seeks consequential damages in an amount to be determined at trial.

## COUNT SIX
### (Anticipatory Breach of Contract)

489.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-488 of this Complaint with the same force and effect as if fully set forth herein.

490.     Pursuant to Section 4 of the Global Settlement Agreement, SGM received a $2.5 million limited partnership interest in MET13 which is equal to 8.31985% of Original MET13 LP Class (as defined in the Global Settlement Agreement) ("SGM's MET13 LP Interest"), pursuant to which SGM is entitled to certain distributions, as set forth in that Section of the Global Settlement Agreement.

491.     Based on the Lisiak Parties' breaches and anticipatory breaches of the Global Settlement Agreement, MET13 owes SGM at present the $2.5 million and any other funds that SGM would be paid pursuant to Section 4 of the Global Settlement Agreement, essentially on account of any sale or other disposition of Reed assets.

492.     In the alternative, in light of Lisiak Parties' breaches and anticipatory breaches and efforts to repudiate or seek to repudiate the Global Settlement Agreement, SGM seeks an order declaring that it retains all rights under Section 4 of the Global Settlement Agreement, and directing that, in the event of any sale of Reed assets, or any other transaction resulting in distributable proceeds, the Lisiak Parties are to deposit all such proceeds with the Court, with the proper allocation of Profits, Losses, and other distributive share rights to be supervised by the Court at that time, if the parties cannot come to a mutually agreeable resolution.

## COUNT SEVEN
### (Indemnification and Attorneys' Fees)

493.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-492 of this Complaint with the same force and effect as if fully set forth herein.

494.    The Lisiak Parties are responsible for SGM's, Mr. Featherly's, Mr. Field's and Regent's respective legal fees and costs and expenses, pursuant to Sections 12(b) and (c) of the Global Settlement Agreement.

495.    Sections 12(b) and (c) provide that the Lisiak Parties:

> hereby agree that each will hold harmless and indemnify the SGM Released Parties, individually and/or collectively, from any claim, demand, action, suit, resulting judgment, costs, disbursements and expenses (including, without limitation, reasonable attorneys' fees and expenses) of any kind or nature whatsoever, resulting from, relating to or founded upon (i) any breach of this Agreement by" the Lisiak Parties "or claims subject to the release provided in Section 11 above.

496.    Further, pursuant to Section 4, Section 11, and Section 14(b) of the New SGM Fee Agreement, Reed is responsible to indemnify and hold harmless SGM Indemnitees for all expenses and liabilities, including reasonable attorneys' fees and expenses, arising out of or in connection with any action arising out of or in connection with, or claimed to arise out of or to be in connection with the breach by Reed of the New SGM Fee Agreement, and any action to interpret or enforce the New SGM Fee Agreement.

497.    Lisiak Parties, and Reed, are liable for the payment of attorneys' fees, costs, and other expenses to SGM. Mr. Featherly, and to Mr. Field and Regent, in an amount to be determined at trial, but in excess of $75,000, pursuant to the referenced sections of the Global Settlement Agreement and the New SGM Fee Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, SGM Holdings LLC and Richard R. Featherly respectfully demand judgment as against Defendants as follows:

(a) On the First Count, monetary damages to be assessed against Reed in an amount to be determined at trial; a lis pendens, liening on Reed's assets, including on Reed's oil and gas leases in Washington County Ohio, to secure the payment of the Compensation and the interest that is currently due and owing SGM and all future Compensation and interest and other substantial sums that are or shortly will be due and owing SGM under the New SGM Fee Agreement and the Global Settlement Agreement; together with a declaration that Reed is insolvent;

(b) On the Second Count, a declaration that SGM and Mr. Featherly do not owe any Services, including specifically that SGM, Mr. Featherly, and their affiliates are not required to provide Reed or MET13 or any other Lisiak Party the right of first refusal on account of Lisiak Parties' breaches of contract and failure to provide Compensation that is condition precedent to SGM and Mr. Featherly providing any of the Services specified, as well as a declaration that Reed is insolvent;

(c) On the Third Count, damages for royalties that SGM would have been paid if Reed, NFI and/or NE Fuel had timely granted and recorded the New SGM ORRI, in an amount to be determined at trial; and an order directing Reed, NFI and NE Fuel to grant and record the New SGM ORRI, the Retained SGM ORRI, the MNW ORRI, and all other Required ORRIs;

(d) On the Fourth Count, an order applicable to all Defendants declaring that Mr. Field and Regent are SGM Released Parties under the Global Settlement Agreement, and that Lisiak Parties breached the Global Settlement Agreement

by asserting claims and threatening litigation as against Mr. Field and Regent, and by encouraging third parties to assert claims and threaten litigation against Mr. Field and Regent, along with payment of attorneys' fees and other indemnification as set forth in the Global Settlement Agreement;

(e) On the Fifth Count, an order declaring that Lisiak and Lisiak Parties breached the Global Settlement Agreement and enjoining and barring Lisiak and Lisiak Parties from making any further disparaging statements about Mr. Featherly or SGM, together with consequential damages in an amount to be determined at trial;

(f) On the Sixth Count, an order finding that Lisiak Parties have breached and anticipatorily breached and sought to repudiate the Global Settlement Agreement, and assessing damages in an amount to be determined at trial, but estimated to exceed $2.5 million, and payment by MET13 of other funds payable pursuant to Section 4 of the Global Settlement Agreement; and an order declaring that SGM retains all rights under the Global Settlement Agreement, and directing Lisiak Parties to deposit all proceeds with the Court in the event of any sale of Reed assets, or any other transaction resulting in distributable proceeds pursuant to the Global Settlement Agreement;

(g) On the Seventh Count, an order granting indemnification and attorney's fees and costs against all Lisiak Parties pursuant to the Global Settlement Agreement and against Reed and MET13 pursuant to the New SGM Fee Agreement, in amounts to be determined at trial, in an amount in excess of $100,000; and

(h) awarding Plaintiffs costs, expenses and disbursements of this action, including

attorneys' fees, together with such other and further relief as this Court may

deem just and proper.

Dated: New York, New York
       July 26, 2013

SCHULMAN BLACKWELL LLP

By: _____
       Dan Schulman
       Deric Gerlach
11 Broadway, Suite 615
New York, NY 10005
P: (646) 225-6600
F:(646) 304-1117
dschulman@schulmanblackwell.com
*Attorneys for Plaintiffs SGM Holdings LLC
       and Richard R. Featherly*